THE SHRINERS' HOSPITAL FOR CRIPPLED CHILDREN &
others[1] *vs*. BOSTON REDEVELOPMENT AUTHORITY & others[2]
(and a companion case[3]).

Suffolk.    June 15, 1976. — September 20, 1976.

Present: HALE, C.J., KEVILLE, & GRANT, JJ.

*Redevelopment of Land.   Practice, Civil,* Parties.   *Boston Redevelop-
ment Authority.    State Building Code.    Moot Question.    Environ-
mental Affairs.*

A hospital abutting the site of a proposed development approved by
the Boston Redevelopment Authority with permission to deviate
from certain requirements of the City of Boston Zoning Code and
from the State Building Code constituted a "person aggrieved" by
the authority's decision within the meaning of St. 1960, c. 652, § 13.
[554-555]
A decision by the Boston Redevelopment Authority to permit redevel-
opment of a parcel of land containing slightly more than half an
acre did not violate G. L. c. 121A and St. 1960, c. 652, §§ 12 and 13.
[555-557]
Findings made by a city's redevelopment authority incorporating lan-
guage from G. L. c. 121A, § 1, but setting forth specific reasons un-
derlying its conclusions were sufficient to permit redevelopment
under c. 121A. [557-559]
Reasons given by a city's redevelopment authority for permitting cer-
tain deviations from the city's zoning code to a redevelopment proj-
ect were adequate as a matter of law. [559-560]
The provisions of St. 1972, c. 802, superseded the provisions of St. 1960,
c. 652, § 13, which had given a city's redevelopment authority the
power to permit deviations from any building code in effect in the
city; a determination that an authority's action in permitting such
deviations by a developer was an error of law required that such
action be quashed even though both the developer and the authority
represented at trial that the only deviations to be incorporated into

---

[1] Charles River Park, Inc., Charles River Park "A", Inc., Seon P.
Bonan, Janet Bonan, Theodore J. Shoolman, Jerome L. Rappaport,
Arthur Rappaport and Sandra Sommer.

[2] Walter K. Winchester and John R. Gallagher.

[3] River Park Pharmacy, Inc. and others *vs*. Boston Redevelopment
Authority and others.

the developer's project were those which had been approved by both the authority and the State Building Code Appeals Board. [560-561]

An environmental impact statement, prepared by a consultant for a city's redevelopment authority and submitted to the Secretary of Environmental Affairs was not an "environmental impact report" of the type contemplated by G. L. c. 30, § 62, and did not imply a determination that the project would cause environmental damage. [561-567]

TWO CIVIL ACTIONS commenced in the Superior Court on October 30, 1975, and October 31, 1975, respectively.

The cases were heard by *Chmielinski, J.*

*Robert J. Muldoon, Jr. (Roger D. Matthews, Robert Gardiner Wilson, III, & John F. Mee* with him) for the plaintiffs.

*Arthur M. Gilman (William F. York* with him) for Walter K. Winchester & another.

*Edward J. Lonergan,* Assistant General Counsel, for Boston Redevelopment Authority.

HALE, C.J. These are proceedings seeking judicial review, in the nature of certiorari (see St. 1960, c. 652, § 13, as amended through St. 1967, c. 127, § 3; G. L. c. 249, § 4, as appearing in St. 1973, c. 1114, § 289; Mass.R.Civ.P. 81 [b], 365 Mass. 841 [1974]), of a vote of the defendant Boston Redevelopment Authority (authority) authorizing the redevelopment (G. L. c. 121A; St. 1960, c. 652, §§ 12-14) of a parcel of land in the so called West End of Boston. The cases were tried together in the Superior Court, and judgments were entered for the defendants.[4] The plaintiffs have appealed to this court.

On July 22, 1975, the defendants Winchester and Gallagher, as general partners of the Blackstone Company (the developer), a limited partnership (see G. L. c. 121A, § 18C; St. 1960, c. 652, § 13A [inserted by St. 1965, c. 859, § 3], as amended), applied to the authority for authoriza-

---

[4] The court entered the following judgment in each case: "Judgment for defendants subject to respondents' compliance with the determination of both the State Building Code Appeals Board and the Boston Redevelopment Authority with respect to the proposed variances from the State Building Code."

tion and approval of a redevelopment "project" (G. L. c. 121A, § 1). The proposed project was and is for the construction, operation and maintenance of a single building on Blossom Street in Boston. The site contains 28,344 square feet (approximately 0.6 acres) of land and is presently occupied by a building known as the Blackstone school, formerly in use but now abandoned and in an advanced state of disrepair.

The developer proposes to erect on the site a fourteen-story building containing 176 dwelling units and 14,000 square feet of commercial space. The dwelling units would be for the use of elderly (including elderly handicapped) persons; the proposed plans for the units incorporate features specifically designed for the needs of such persons.[5]

A public hearing was held on August 27, 1975. On September 25, 1975, the authority issued a "Report and Decision" which, in all material respects, approved the application. See St. 1960, c. 652, § 13 (sixth paragraph), as appearing in St. 1965, c. 859, § 2; G. L. c. 121A, § 6. The authority found that the project area was a "blighted open area" and a "decadent area" as those terms are defined in G. L. c. 121A, § 1. It took note of the shortage of suitable housing accommodations for elderly persons of low and moderate incomes.[6] It found that the project "will not cause any significant damage to the environment as defined by Chapter 30, Section 61, of the General Laws . . .." The authority also granted permission for the developers to deviate from certain requirements of the City of Boston Zoning Code and from the State Building Code, as the developer had requested in its application. See St. 1960, c. 652, § 13 (ninth paragraph).

---

[5] From the evidence before us it appears that the developer had sought and obtained the cooperation of nearby property owners, including at least some of the plaintiffs, in arriving at the final proposal. Earlier proposals had been for buildings as high as twenty-three stories and containing as many as 280 units.

[6] The report also indicated the intention of the authority to make at least some of the Blackstone project apartments available to former residents of the West End area who had been forced to relocate when the greater part of that area was redeveloped under other projects.

The vote of the authority approving the application was approved by the mayor of Boston on September 30, 1975. On October 1, 1975, the authority filed a certificate of its vote with the Boston city clerk. See St. 1960, c. 652, § 13, as amended (penultimate paragraph) (note 8, *infra*). The present actions under § 13 (see and compare G. L. c. 121A, § 6C, inserted by St. 1975, c. 827, § 5) were filed on October 30 and 31, 1975.

1. So far as appears from the consolidated record, the plaintiffs in both cases are nearby property owners or lessees. The Shriners' Hospital for Crippled Children (hospital) abuts the project site on the north. The individual defendants are the general partners of several limited partnerships which, together with two of the corporate plaintiffs, were organized pursuant to the redevelopment of the West End area of Boston during the 1960's. The other corporate plaintiffs operate certain business establishments in the immediate vicinity of the project site. The record does not indicate which (if any) of the various partnerships (or corporations) own (or lease) land that directly abuts the project site.

The Superior Court determined that the plaintiffs had no standing to challenge the action of the authority in approving the project but held that the plaintiffs did have standing to challenge the authority's action with respect to the deviations granted from the City of Boston Zoning Code and the State Building Code, and with respect to the issue of compliance with G. L. c. 30, §§ 61 and 62, regarding environmental impact.[7] We are of the opinion that the hospital has standing to challenge all of the actions of the authority leading to the approval of the project, and as it will not affect the outcome of the cases, we need not decide whether the other plaintiffs have like standing. For the purposes of this case, we assume that they have. Section 13 of St. 1960, c. 652, as amended,[8]

---

[7] The defendants have not appealed from that ruling.

[8] The penultimate paragraph of St. 1960, c. 652, § 13 (as amended through St. 1967, c. 127, § 3), states: "When any vote of the authority

provides that within thirty days following the filing of the vote of the authority, "any person, whether previously a party to the proceeding or not, who is aggrieved by such vote...may file a petition...for a writ of certiorari against the authority to correct errors of law therein." It is settled that the term "person aggrieved" is "to be given a comprehensive meaning." *Dodge* v. *Prudential Ins. Co.* 343 Mass. 375, 381 (1961) (construing §13). See *Marotta* v. *Board of Appeals of Revere,* 336 Mass. 199, 204 (1957) (construing analogous language appearing in G. L. c. 40A, § 21). The property on which the hospital is situated abuts the development site; shadows cast by the proposed structure will fall upon parts of the hospital, and any other impact on the environment would be likely to affect directly the hospital property and the persons occupying it; the variances from the city zoning code and deviations from the State building code granted to the developers are subjects of proper concern to the hospital for the reason stated by the trial court — erroneous action in these areas would cause direct injury to the property interests of the hospital.

2. The plaintiffs submit that the authority abused its discretion in selecting the Blackstone Company as the developer of the site. Their argument on that point is based not on the qualifications of the developers or on alleged inadequacies of the proposal but rather on the fact that the size of the parcel (approximately 0.6 acres) is

---

under this or the preceding section becomes final, the secretary of the authority shall file with the city clerk of the city of Boston a copy of such vote attested by such secretary with, in cases where approval of such vote by the mayor is required, a copy of such approval likewise attested. Within thirty days after such filing, any person, whether previously a party to the proceeding or not, who is aggrieved by such vote, or any municipal officer or board, may file a petition in the supreme judicial or superior court sitting in Suffolk County for a writ of certiorari against the authority to correct errors of law therein; and the provisions of section one D of chapter two hundred and thirteen, and of section four of chapter two hundred and forty-nine, of the General Laws, shall apply to said petition except as herein provided with respect to the time for the filing thereof. The remedy provided by this paragraph shall be exclusive."

so small that a decision to develop the site pursuant to
c. 121A violates the intent and purpose of the redevelop-
ment laws. The short answer to that contention is that
this court will not "sit in review on the size of a particular
project area." *Berman* v. *Parker,* 348 U. S. 26, 35 (1954).
Our review of G. L. c. 121A and of St. 1960, c. 652, §§ 12
and 13, discloses no indication of a legislative intent to
prescribe a minimum (or maximum) size of an area which
may be redeveloped thereunder. See especially the defini-
tions and declaration of public necessity set forth in G. L.
c. 121A, §§ 1 and 2. To the contrary, the clear intent of
the statutes is to permit the appropriate redevelopment
agency, within the broad and comprehensive guidelines
delineated, to approve (or disapprove) proposed projects
for any area, provided that the area is found to be a
"blighted open," "decadent," or "substandard" area, and
provided also that the proposed project meets the "public
use" requirement of G. L. c. 121A, § 2. See *Stockus* v.
*Boston Housing Authy.* 304 Mass. 507, 509-510 (1939);
*Moskow* v. *Boston Redevelopment Authy.* 349 Mass. 553,
561 (1965), cert. den. 382 U. S. 983 (1966). See also *Ally-
donn Realty Corp.* v. *Holyoke Housing Authy.* 304 Mass.
288, 291 (1939). In the present cases it is undisputed that
the proposed project — the construction of a substantial
number of dwelling units for elderly persons with low and
moderate incomes — serves a public purpose and is de-
signed to fulfill a demonstrated need.

The statutory framework enables the appropriate rede-
velopment agency to consider the unique characteristics
of each site in making its determinations. Several unique
characteristics of the Blackstone site should be noted. The
site is irregularly shaped; the building currently on the
site — a school building — is abandoned, and has been un-
used for many years; the site abuts (and part of it was
originally included within) the West End Land Assembly
and Redevelopment Project, a comparatively large area
previously found by the authority to be a blighted open,
decadent, and substandard area. Thus, the redevelopment
of the Blackstone site can be seen, not as the isolation of

one small parcel for redevelopment but as a slight expansion of a larger redevelopment site, reflective of changed conditions in the area.

3. The plaintiffs challenge the sufficiency of the findings made by the authority in its report. The substance of their argument is that the findings (which are reproduced in the margin[9]) amount to little more than "a mere repeti-

---

[9] "The Authority hereby finds that the Project area is a 'blighted open area' within the meaning of Section 1 of Chapter 121A of the General Laws because it is detrimental to the safety, health, morals, welfare and sound growth of the West End Community, and unduly costly to develop through the ordinary operations of private enterprise by reason of:
1. the existence of unsuitable subsoil conditions which will require the sinking of piles to a depth of well over fifty (50) feet;
2. the obsolete and inappropriate platting of the area as is evidenced by the irregular shape of the Project site;
3. the deterioration of the Blackstone School building which is presently on the site and which bears marked evidence of vandalism;
4. the substantial changes in the business and economic conditions in the West End Area of the City of Boston which changes have caused the anticipated use of the Blackstone School for school purposes to be abandoned;
5. the abandonment or cessation of the use of the Blackstone School by the City of Boston which has resulted in the physical deterioration of the building;
6. the existence of the Blackstone School building which must be razed in order to allow any further meaningful and beneficial future development on the site;
7. the combination of all of the conditions listed above which are not, in fact, being remedied by the ordinary operation of private enterprise, and which are of such a character that they are in essence detrimental to the safety, health, morals, welfare and sound growth of the West End Area and the City of Boston.
"The Authority hereby also finds that the Project area is a 'decadent area' within the meaning of Section 1 of Chapter 121A of the General Laws because it is detrimental to the safety, health, morals, welfare and sound growth of the West End Area of the City of Boston by reason of:
1. the existence of the Blackstone School building which is infested with rats, the presence of which condition is not only intolerable and psychologically debilitating, but which has caused abutting owners the additional burden of having to expend funds for the implementation of rat-proofing measures in order to protect their own property.
2. the substantial change in the business and economic characteristics of the West End Area over the past two decades;
3. the irregular lot size and shape of the Project site which will make it improbable that the area will be developed by any ordinary operation of private enterprise;

tion˙ of the statutory words. . . ." *Prusik* v. *Board of Appeal of Boston,* 262 Mass. 451, 457-458 (1928). Having carefully reviewed the entire consolidated record, we agree with the determination of the Superior Court that the findings are supported by the record and are sufficient to permit redevelopment under G. L. c. 121A.

An analysis of the subsidiary findings reveals that they are not extensively detailed and that they do in fact incorporate language from the definitions of "Blighted open area" and "Decadent area" appearing in G. L. c. 121A, § 1. Such incorporation, standing alone, would, as the plaintiffs contend, be insufficient as a matter of law to substantiate a determination that a particular site was "blighted" or "decadent." However, the findings here clearly go beyond a bare repetition of statutory language, and specific reasons underlying the authority's conclusions have been set forth. A detailed engineering report on the soil and subsurface conditions fully supports the finding of "unsuitable subsoil conditions." The building plans disclose the irregular shape of the site. Photographs of the Blackstone school building as it now stands, together with

---

4. the combination of all of the above listed conditions.

"The Authority is also cognizant of the fact that the implementation of the West End Land Assembly and Redevelopment Project during the past two decades has caused the physical relocation of many long-time West End residents who have been assured of places to live in their old community. This Project specifically responds to that need and assurance by providing housing for many of those who were forced to leave their homes during this period.

"As has been noted above, the conditions which are causing the blight and deterioration are not being remedied by the ordinary means of private or public enterprise. These conditions warrant the carrying out of the Project in accordance with Chapter 121A of the General Laws and the proposed construction, operation, and maintenance of decent, safe, and sanitary housing and commercial facilities proposed by the Applicants in their Application constitutes a 'Project' within the meaning of that law. The purpose of Chapter 121A and Chapter 652 of the Acts of 1960 will be met by this Project. The demand for such housing for elderly individuals and elderly couples at rent levels below those which the conventional operations of the real estate market produce, is, as a matter of common knowledge, intense. Construction of the units and facilities proposed for the Project Area will serve to alleviate this intense demand, and will, in addition, encourage the conservation and improvement of the area."

other documentary evidence, show the deterioration and abandonment of that structure. The plaintiffs' attack on the fourth "blighted open area" finding is an attempt to isolate that finding from its context and does not merit extensive discussion. The finding that business and economic conditions in the area have changed substantially (which the plaintiffs do not dispute) serves primarily to explain why the use of the site as a school, as was intended when the site was omitted from the earlier extensive West End redevelopment, has been abandoned.

4. The plaintiffs next contend that the authority abused its discretion in granting certain deviations from the City of Boston Zoning Code for the Blackstone project.[10]

Under the ninth paragraph of St. 1960, c. 652, § 13, as appearing in St. 1965, c. 859, § 2, the authority, with the approval of the mayor of Boston, is given exclusive power to grant deviations from zoning, building, health or fire standards in effect in Boston. The plaintiffs recognize, as they must, that the standards for granting deviations under that section are less restrictive than those governing the granting of variances under the zoning laws. Compare St. 1960, c. 652, § 13, with G. L. c. 40A, § 10 (inserted by St. 1975, c. 808, § 3). Compare *Miller* v. *Emergency Housing Commn.* 330 Mass. 693, 697-698 (1953) (construing a standard under St. 1946, c. 592, substantially identical to that contained in St. 1960, c. 652, § 13), with *Garfield* v. *Board of Appeals of Rockport,* 356 Mass. 37, 40-41 (1969), and *Damaskos* v. *Board of Appeal of Boston,* 359 Mass. 55, 60-61 (1971).

The questions concerning the several deviations granted by the authority "are primarily questions of fact although they may become questions of law. Insofar as they remain

---

[10] The deviations sought by the developer in its application and granted by the authority included deviations from use requirements to permit retail business establishments on the lower floors of the proposed building, as well as several deviations from various dimensional requirements, such as reductions of usable open space per each dwelling unit, reduction of front and side yard requirements, reduction of setbacks, and reduction of off-street parking facilities.

in the realm of fact they are matters for the ... [authority] to determine." *Miller* v. *Emergency Housing Commn.*, *supra*, at 698. In a proceeding seeking relief in the nature of certiorari our duty is to ascertain whether the reasons given by the authority in support of its determination, as they appear in the authority's answer, are erroneous as a matter of law. See *Norcross* v. *Board of Appeal of Boston*, 255 Mass. 177, 186 (1926). "With their soundness in point of fact we have nothing to do." *Ibid.* It is unnecessary to recite here the respective reasons underlying the granting of the various deviations. It is sufficient to say that in each instance the reasons given are adequate as a matter of law and (as mandated by St. 1960, c. 652, § 13) do not substantially derogate from the intent and purposes of the City of Boston Zoning Code.

5. The plaintiffs also challenge the power of the authority to grant deviations from the State Building Code. See G. L. c. 23B, §§ 16-23. The State Building Code became effective on January 1, 1975. St. 1972, c. 802, § 67.

The basis of the plaintiffs' argument is that the State Building Code Appeals Board (G. L. c. 23B, § 23) has the exclusive power to grant such deviations. Further support for this contention is to be found in St. 1972, c. 802, § 67 ("[s]aid code shall be binding and have the full force and effect of law on January ... [1, 1975], *in all cities and towns notwithstanding any special or general law to the contrary*" [emphasis supplied]), and in § 75 (as amended by St. 1975, c. 144, § 1) ("[a]ll by-laws and ordinances of cities and towns or regulations promulgated by any state boards, commissions, agencies or departments or any special acts ... in conflict with the state building code shall cease to be effective on January ... [1, 1975]").

The above quoted sections, together with the whole of c. 802 and its subsequent amendments, evince a clear legislative intent, as the Superior Court found, to create uniform standards throughout the Commonwealth for the construction of buildings and materials used therein and to provide both a uniform enforcement procedure and an

exclusive appeals procedure. We agree with the determination of the Superior Court that the relevant provisions of St. 1972, c. 802, were intended to supersede those provisions of St. 1960, c. 652, § 13, which had given the authority the power to grant deviations "from any ... building ... code ... in effect in Boston ..." and on which the authority purported to base its vote. See *McDonald* v. *Superior Court,* 299 Mass. 321, 324 (1938); *Rennert* v. *Trustees of State Colleges,* 363 Mass. 740, 743-744 (1973).

Although he indicated his agreement with the plaintiffs' position on this issue, the Superior Court judge did not order that the vote of the authority purporting to grant these variances be quashed. Instead, the judge ruled that the issue was moot (see fn. 4, *supra*), based on the representations made at trial by counsel for the developer and the authority "that the only deviations which will be incorporated ... into the Blackstone project will be those deviations which have been approved by *both* the State Building Code Appeals Board and the respondent Authority" (emphasis in original). On this point we disagree with the Superior Court. The issue is not moot. See *Wolf* v. *Commissioner of Public Welfare,* 367 Mass. 293, 297-300 (1975). The representations made by counsel at trial do not relieve the court of its duty, in an action seeking relief in the nature of certiorari, to review any alleged errors of law. The determination of the Superior Court that the provisions of St. 1972, c. 802, superseded those of St. 1960, c. 652, § 13, with which we agree, was in effect a determination that the action of the authority purportedly granting those variances was an error of law. Such a determination required that the action of the authority be quashed.

6. Our decision in part 5 of this opinion, *supra,* renders it unnecessary to consider the issues raised in part VI of the plaintiffs' brief, as they are premised on a determination that the authority had the power to grant variances from the State Building Code.

7. Finally, the plaintiffs allege error in the finding by the authority that no significant environmental damage

would be caused by the project.[11] In its report the author-
ity stated that it "ha[d] made an environmental analysis
evaluating the [p]roject" and went on to enumerate spe-
cific findings (see findings 1-9 set out in fn. 11) on the
issue of environmental damage. The authority concluded
"that the Project will not cause any significant damage
to the environment as defined by ... [G. L. c. 30, § 61[12]],

---

[11] "ENVIRONMENTAL CONSIDERATIONS

"In conformance with the provisions of Sections 61 and 62 of Chap-
ter 30 of the General Laws, as inserted by Chapter 781 of the Acts of
1972, and the Regulations thereunder as adopted by the Authority on
April 11, 1974, the Authority has made an environmental analysis
evaluating the Project, which contains the following findings:

1. The Project will have virtually no effect on the site which it oc-
cupies, causing no land or soil erosion and no change in the ground
water level;

2. The Project will have no effect on local vegetation and natural areas;

3. The Project will be compatible with the surrounding high density
area. It will cast no significant shadows on neighboring buildings;

4. There will be no impact in terms of increasing the load on existing
infrastructure facilities;

5. There will be minimal car ownership by those occupying the Project,
therefore, there will be virtually no impact on the present amount of
traffic in the area and there will be no substantial increase in the
amount of air pollution generated;

6. The Project will not increase the noise levels in the surrounding
environment;

7. The Project will have no effect on the quality of Boston's water
supply, nor will it have any effect on the quality of the water of the
Charles River;

8. The Project will require deviations from the State Building Code as
noted below, but not in such manner as will cause damage to the en-
vironment;

9. The Project does not result in the generation of a significant amount
of noise or dust, except during the construction period.

"The Authority therefore concludes that the Project will cause only
minimal damage to the environment, and that all feasible measures
have been taken to avoid or minimize said impact. The Environmental
Assessment of the Project has been completed by the Authority and
the MHFA, and a joint report has been filed by the Authority and the
MHFA with the Secretary of Environmental Affairs. The Authority
hereby determines that the Project will not cause *any significant dam-
age to the environment* as defined by Chapter 30, Section 61, of the
General Laws, and finds that no further action need be taken in this
regard" (emphasis supplied).

[12] The second paragraph of G. L. c. 30, § 61 (as amended through
St. 1973, c. 989, § 4), provides: "As used in this section and section
sixty-two 'damage to the environment' shall mean any destruction,
damage or impairment, actual or probable, to any of the natural re-

and finds that no further action need be taken in this regard."

The authority's answer asserts that "the Environmental Assessment of the Project has been completed by the authority and the MHFA, and a joint report has been filed ... with the Secretary of Environmental Affairs." (See fn. 11.) So far as appears from the record, the "report" alluded to appears to be a document entitled "Environmental Impact Statement," prepared for the developer by a private consultant. The findings contained in that "report" are consistent with those made by the authority. It appears that the "report" was submitted to the developer in January of 1975, more than three months before the developer submitted its application to the authority. The filing of the document with the Secretary of Environmental Affairs forms the basis of the plaintiffs' challenge. The plaintiffs characterize the document filed as a report of the type required in certain circumstances by G. L. c. 30, § 62.[13] We take this to allude to the second paragraph of that section.

---

sources of the commonwealth and shall include but not be limited to air pollution, water pollution, improper sewage disposal, pesticide pollution, excessive noise, improper operation of dumping grounds, impairment and eutrophication of rivers, streams, flood plains, lakes, ponds, or other surface or subsurface water resources; destruction of seashores, dunes, marine resources, underwater archaeological resources, wetlands, open spaces, natural areas, parks, or historic districts or sites. *Damage to the environment shall not be construed to include any insignificant damage to or impairment of such resources"* (emphasis supplied).

[13] General Laws c. 30, § 62 (as amended through St. 1974, c. 257, §§ 1 and 2), provides in part: "No agency, department, board, commission, or authority of the commonwealth or any authority of any political subdivision thereof shall commence any work, project, or activity which may cause damage to the environment until sixty days after it has published a final environmental impact report in accordance with the provision of this section or until sixty days after a public hearing on said report, provided that research, planning, design and other preliminary work necessary to describe and evaluate such project for the purposes of this section may be undertaken.

"Any such agency, department, board, commission, authority or any authority of any political subdivision which grants permit determinations, orders or other actions shall prepare an environmental impact report for any work, project or activity of any private person, firm or

The plaintiffs acknowledge the existence of the remedy provided in G. L. c. 30, § 62, to review allegedly improper determinations regarding environmental impact (see the final paragraph of § 62, [fn. 13]; *Secretary of Environmental Affairs* v. *Massachusetts Port Authy.* 366 Mass. 755, 761-762 [1975] [hereinafter the *Massport* case]). The plaintiffs also recognize that the function of the court in a proceeding seeking relief in the nature of certiorari is

---

corporation which may cause damage to the environment and for which no funds of the commonwealth are to be expended, provided that such report shall be limited in scope to the subject matter jurisdiction of such agency, department, board, commission, authority or authority of a political subdivision by which said report is prepared. No action shall be brought to compel any such agency, department, board, commission, authority or authority of a political subdivision or any such private person, firm or corporation to make, cause to be made or have made on its behalf any environmental impact report other than the report required by this section.

"Environmental impact reports for any work, project or activity of private persons, firms or corporations shall be submitted to the secretary of environmental affairs for comment, and such comment, if any, shall be submitted to the agency, department, board, commission, authority or authority of any political subdivision by which said report is prepared within thirty days from its receipt. The approval or disapproval of said secretary of any such report shall not be required.

\* \* \*

"Any action or proceeding alleging that an agency, department, board, commission, authority or authority of any political subdivision has improperly determined whether a work, project or activity may cause significant damage to the environment shall be commenced not later than sixty days after the date upon which the secretary of environmental affairs shall issue his comment, if any, on the environmental impact report prepared by such agency, department, board, commission, authority or authority of any political subdivision in connection with such work, project or activity, or not later than ninety days after the date upon which such agency, department, board, commission, authority or authority of any political subdivision shall have transmitted such report to said secretary, whichever date occurs first. Any action or proceeding alleging that an environmental impact report fails to comply with the provisions of this section shall be commenced no later than thirty days after the date upon which the final environmental impact report has been transmitted by an agency, department, board, commission, authority or authority of any political subdivision to the secretary of environmental affairs. In the event that the comments of the secretary of environmental affairs indicate his detailed reasons for his finding that such final environmental impact report fails to comply with the provisions of this section, the time during which any action may be commenced alleging that such report fails to comply with said section shall be extended for an additional period of thirty days."

ordinarily limited to a determination of whether an error of law is apparent on the record. *Stetson* v. *Selectmen of Carlisle,* 369 Mass. 755, 757 (1976). Thus, the plaintiffs do not attack directly the environmental findings made by the authority but assert that an error of law is nevertheless apparent. The essence of their argument, as we perceive it, is that if the authority, as it did here, makes a determination of no significant environmental damage (a so called "negative assessment"), no report of any kind need be filed with the Secretary of Environmental Affairs under § 62. See the *Massport* case, *supra,* at 768. Hence, the plaintiffs argue, the fact that a report was filed in this case is tantamount to determination that the project will cause significant environmental damage.

There is no merit to that argument. General Laws c. 30, § 62 (see fn. 13), requires an authority to prepare an environmental impact report only in the case of any work, project, or activity "which may cause damage to the environment." By definition (G. L. c. 30, § 61, second par. [see fn. 12]) such damage does not include "any insignificant damage to or impairment of" the environment. "[T]he threshold of potential environmental damage to warrant an impact statement . . . is minimal." The *Massport* case, 366 Mass. at 768-769. The authority made subsidiary findings of fact which determined "that the project will not cause any significant damage to the environment as defined by c. 30, § 61, of the General Laws, and [found] that no further action need be taken in this regard" (fn. 11). See the *Massport* case, 366 Mass. at 767-768.

Not only are those findings supported by the consultant's "report," but there is nothing in that "report" which would support a conclusion to the contrary, and the plaintiffs do not contend otherwise. It also appears that an environmental assessment of the project was filed with the Secretary of Environmental Affairs.[14] That assessment was not included in the record before us. The plaintiffs'

---

[14] Nothing in the record indicates that the Secretary of Environmental Affairs responded in any way to this filing.

argument concedes that there was such a filing but, as stated above, questions whether the statement concluded with a "negative determination." While the consultant's "report" might well have been sufficient in form and content as an impact report (or a draft of one), the Superior Court reached the conclusion that the consultant's report was used by the authority merely to support its negative assessment. We concur in that conclusion. It appears to us that the document filed should be characterized as a supportive document rather than as a true "environmental impact report" of the type contemplated by § 62. A true § 62 report would be required only upon a threshold determination of at least minimal environmental damage. That threshold was not crossed in these cases.

In sum, the authority made the determination that the project would not cause significant environmental damage, as defined by the second paragraph of § 61 (see fn. 12). There is nothing in the record which indicates that that determination was erroneous as a matter of law. Therefore, preparation of a draft or final environmental impact report under § 62 was not required. The decision of the authority to file the supportive document, even though such filing was not required by § 62, was not an error of law.[15]

As we have determined that the action of the authority purporting to grant deviations from the State Building Code was an error of law (see part 5 of this opinion), the judgments entered in the Superior Court (see note 4, *supra*) cannot stand. If the action of the authority approving the project had consisted of several distinct parts, we would order quashed only that part concerning the State Building Code deviations. See *Commonwealth* v. *Carpenter*, 3 Mass. 268, 270 (1807); *Commonwealth* v. *Blue-Hill Tpke. Corp.* 5 Mass. 420, 422-424 (1809); *Com-*

---

[15] As we have determined that the document filed with the Secretary of Environmental Affairs was not used as a true § 62 report, it becomes unnecessary to consider the plaintiffs' subsidiary argument that it was error under § 62 to have an environmental impact report prepared by a private consultant.

*monwealth* v. *West Boston Bridge,* 13 Pick. 195, 196-198 (1832). However, as the vote of the authority approving the project was unitary, and as the granting of the deviations was integral to that approval, the vote of the authority as it now stands must be quashed. See *Dwight* v. *City Council of Springfield,* 4 Gray 107, 110 (1855). The judgments of the Superior Court are vacated. However, as the developers and the authority represented to the Superior Court that the only deviations from the State Building Code which will be incorporated into the project will be those approved by both the State Building Code Appeals Board and the authority, we believe that an opportunity should be afforded to obtain such approvals. See *Village on the Hill, Inc.* v. *Massachusetts Turnpike Authy.* 348 Mass. 107, 119-120 (1964), cert. den. 380 U. S. 955 (1965); *Kelloway* v. *Board of Appeal of Melrose,* 361 Mass. 249, 257-258 (1972). The Superior Court is to retain jurisdiction of the cases for the entry of judgments in accordance with this opinion, first affording the developer an opportunity to secure from the board variances from the requirements of the State Building Code (G. L. c. 23B, § 23), and the approval of any such variances by the authority. The times within which such approvals are to be sought and of all further proceedings in these cases are to be in the discretion of the Superior Court.

*So ordered.*