RITA CHRISTENSEN *vs.* BOSTON REDEVELOPMENT AUTHORITY & others.[1]

No. 02-P-1121.

Suffolk. November 18, 2003. - March 15, 2004.

Present: DUFFLY, DREBEN, & KAFKER, JJ.

*Redevelopment Authority. Redevelopment of Land. Urban Renewal. Administrative Law,* Substantial evidence. *Zoning,* Variance.

In a civil action challenging the determination of the defendant redevelopment authority that a particular project to develop a vacant parcel of land qualified as an urban redevelopment project, the judge properly granted judgment in favor of the defendant, where substantial evidence supported the defendant's determination that the project area was a "blighted open area" within the meaning of G. L. c. 121A, § 1; moreover, the defendant's findings set forth specific reasons for its conclusion, the review of the parcel at issue was individualized, nothing in the statute suggested that a blighted open area could not exist in or near an otherwise vibrant neighborhood, and the record supported the determination that the proposed project represented a public use and benefit. [619-623]

In a civil action challenging the determination of the defendant redevelopment authority that a particular project to develop a vacant parcel of land qualified as an urban redevelopment project, the judge properly granted judgment in favor of the defendant, where substantial evidence supported the defendant's determination that zoning deviations that it granted would not substantially derogate from the intent and purpose of the municipal zoning code or conflict with the master plan for the city. [623-625]

CIVIL ACTION commenced in the Superior Court Department on May 26, 2000.

The case was heard by *Allan van Gestel,* J., on motions for judgment on the pleadings.

*Daniel J. Wilson (Herbert P. Gleason* with him) for the plaintiff.

*Saul A. Schapiro* for Boston Redevelopment Authority.

*Gerald J. Caruso* for Rose Associates, Inc., & another.

[1]Rose Associates, Inc., and Sandwell, LLC.

616         60 Mass. App. Ct. 615 (2004)

Christensen v. Boston Redevelopment Authority.

KAFKER, J. The defendant Rose Associates, Inc., proposes to develop a twelve-story office building, to be known as Two Financial Center, on a vacant parcel owned by another defendant, Sandwell, LLC,[2] in the Leather District neighborhood of the city of Boston (city).[3] The developer sought review and approval by the third defendant, the Boston Redevelopment Authority (BRA), of the vacant parcel as an urban redevelopment project pursuant to G. L. c. 121A.[4]

The BRA held a public hearing to consider the developer's c. 121A application and issued a "Report and Decision" approving the application. See St. 1960, c. 652, § 13, as appearing in St. 1965, c. 859, § 2; G. L. c. 121A, § 6. The BRA determined that "[t]he Project Area is a 'blighted open area[']" within the meaning of Section 1 of Chapter 121A," a necessary finding to confer c. 121A status and its tax and financing benefits. The BRA also granted zoning relief as authorized by St. 1960, c. 652, § 13, as appearing in St. 1965, c. 859, § 2, from various dimensional requirements of art. 44 of the Boston Zoning Code, covering the special overlay zoning district for the Leather District.

By an action in the nature of certiorari, the plaintiff challenged the BRA's decision in Superior Court.[5] See St. 1960, c. 652, § 13, as appearing in St. 1965, c. 859, § 2. See also *Boston Edison Co.* v. *Boston Redev. Authy.*, 374 Mass. 37 (1977); *Shriners' Hosp. for Crippled Children* v. *Boston Redev. Authy.*, 4 Mass. App. Ct. 551, 552 (1976). The plaintiff filed a motion for judgment on the pleadings, which the defendants opposed. After a hearing, a Superior Court judge denied the plaintiff's motion and allowed the defendants' request that judg-

---

[2]We refer to Rose and Sandwell collectively as the developer.

[3]As described in the Leather District Plan for the city dated May, 1990, "[t]he Leather District encompasses a small piece of downtown Boston bordered on the west by the Surface Central Artery; on the south by Kneeland Street; on the north by Essex Street; and, on the east by Atlantic Avenue." Its neighbors include Chinatown and the South Station Economic Development Area.

[4]The BRA is vested with the authority to administer and supervise G. L. c. 121A redevelopment projects in the city, pursuant to St. 1960, c. 652, § 12.

[5]Although there were eleven plaintiffs named in the complaint, only Christensen is a party to this appeal. According to the plaintiff's appellate brief, she has "been selected by the plaintiffs as their representative on appeal."

ment enter in their favor. Final judgment entered dismissing the plaintiff's complaint, and the plaintiff appealed. On appeal, the plaintiff argues that there was not substantial evidence to support (1) the BRA's finding of "blight"; and (2) the BRA's grant of deviations from art. 44 of the Boston Zoning Code. For the reasons stated herein, we conclude that the BRA's determinations were supported by substantial evidence.

*Background.* The planned location for Two Financial Center is a vacant parcel of land at the corner of Essex and South Streets in Boston that is currently used as a surface parking lot for up to eighty-three vehicles. The irregularly shaped, trapezoidal parcel is approximately .44 acres and has been vacant since 1958, when existing buildings were demolished. It is located across from the forty-six story One Financial Center building and adjacent to the eleven-story Hotel Essex building. The parcel is at the northern edge of the zoning district known as the Leather District.

The original project design, consisting of a twenty-story, 277-foot high building, with 360,000 square feet of gross floor area, required "Large Project Review" under art. 80 of the Boston Zoning Code.[6] The developer filed a Project Notification Form (PNF) with the BRA under art. 80. The BRA issued a "Scoping Determination" on July 9, 1999, in response to the PNF, which required the developer to issue a more comprehensive "Draft Project Impact Report" (DPIR).

Following an extensive public process, the developer filed the required DPIR on March 3, 2000. The DPIR assessed the project's impact on transportation, wind, shadow, daylight, air quality, noise, solid and hazardous wastes, water quality, stormwater management, geotechnical conditions, groundwater, historical resources and infrastructure, and proposed mitigation measures. Notably, the DPIR proposed a reduction in the size of the project to fifteen stories (205 feet) with 252,500 square feet of gross floor area.

---

[6]According to art. 80, § 80B-2(1)(a) of the Boston Zoning Code, "Large Project Review shall apply to any Proposed Project" having a gross floor area of 50,000 square feet or more. The purpose of Large Project Review is "to assess a project's impacts on its surroundings and on City resources and to identify necessary mitigation measures." Boston Zoning Code, art. 80, § 80B-1. Section 80B-5 of art. 80 provides the procedures for Large Project Review.

Following further discussions with the BRA and interested parties, the developer agreed to reduce the size of the project contingent on its approval as a G. L. c. 121A project. The developer contended that the loss of three more stories and the cost of the proposed building made it financially infeasible absent c. 121A relief. The developer submitted confidential pro forma development and operating budgets to that effect to the BRA.[7] The developer filed an "Application for Approval of a Project under Chapter 121A" on March 30, 2000. A "Notice of Project Change" was then filed on April 11, 2000, and reflected the adjustments to scale. The final plan describes a twelve-story office building, with some retail space, as well as a five-level subterranean parking garage for up to 250 vehicles.

The BRA held a public hearing on April 25, 2000, to consider the G. L. c. 121A application for Two Financial Center. The BRA issued its "Report and Decision," also dated April 25, 2000, that approved all material aspects of the application. The BRA determined that the project "will permanently and comprehensively overcome the blighting conditions existing in the Project Area, but can only do so with the aids provided by Chapter 121A." The report stated that "the subsurface conditions; the high water table; the need to protect [an abutting building] with expensive slurry wall construction; the encumbrance of the Project Area by [a] storm drain and sewer easement; the small lot area; the disproportionately expensive construction cost[;] and windowless walls[] combine to make redevelopment of the Project Area unduly costly and for more than twenty years have prevented the elimination of the blighting influence of the surface parking lot through the ordinary operations of private enterprise alone."

The BRA further determined that the "creation of a lively mixed-use development removes the blighting influence of the surface parking lot, and fills a hole in the urban fabric with an attractive building on the northern end of the Leather District." It also determined that the project provided commercial office space "sorely needed" in the city at the time.

The BRA addressed the zoning deviations, including that the

---

[7]These documents were included in the record appendix.

permitted height for the building as of right was 100 feet with a floor to area ratio (FAR) of 8, while the proposed building was approximately 162 feet high with a FAR of approximately 11.3. The BRA concluded that the twelve-story project "serves to mediate between the high office buildings of the Downtown, and the smaller-scaled historic buildings of the Leather District and Chinatown." The BRA found that the project incorporated "many significant architectural elements of the Leather District including a strong base [and street wall],[8] cornice lines which reinforce the heights of adjacent properties,[9] corner entries,[10] and materials which are similar to the brick and stone of the district."[11] The BRA determined that the deviations may be granted "without substantially derogating from the intent and purposes of the [zoning code]." The BRA also found the project consistent with the city's master plan.

*Discussion. 1. General Laws c. 121A determination.* "Chapter 121A was enacted in response to a legislative determination that the continued existence of blight and decay posed a threat to the health and safety of the inhabitants of the Commonwealth." *Boston Edison Co.* v. *Boston Redev. Authy.*, 374 Mass. 37, 45 (1977). We have held that "the clear intent of the statutes is to permit the appropriate redevelopment agency, within the broad and comprehensive guidelines delineated, to approve (or disapprove) proposed projects for any area, provided that area is found to be a 'blighted open,' 'decadent,' or 'substandard' area, and provided also that the proposed project meets the 'public use' requirement of G. L. c. 121A, § 2." *Shriners' Hosp. for Crippled Children* v. *Boston Redev. Authy.*, 4 Mass. App. Ct. 551, 556 (1976). The BRA's determination that a project site is

---

[8]The first two stories of the building feature columns and windows characteristic of Leather District architecture. The street wall rises straight up from the sidewalk line.

[9]Cornices are molded and projecting architectural features on buildings, often at the roof lines, see Webster's Third New Intl. Dictionary 508 (1993), but in this case, also used to create a visual break where the upper floors of the building are set back twenty feet along South Street.

[10]The primary entrance to the proposed building would be located in an angled corner bay.

[11]The Massachusetts Historical Commission also determined that the project will have "no adverse effect" on the historic, architectural, and cultural resources" of the Leather District.

blighted must be supported by substantial evidence. See *Boston Edison Co.* v. *Boston Redev. Authy.*, *supra* at 50. "Although we must examine the entire record . . . we may not substitute our judgment for" the BRA's. *1001 Plays, Inc.* v. *Mayor of Boston*, 387 Mass. 879, 885 (1983).

General Laws c. 121A, § 1, provides a broad and comprehensive definition of "blighted open area." It defines a blighted open area as "a predominantly open area which is detrimental to the safety, health, morals, welfare *or* sound growth of a community *because* it is unduly costly to develop it soundly through the ordinary operations of private enterprise *by reason of* the existence of . . . physical conditions, *or by reason of* the necessity for unduly expensive excavation, fill *or* grading, *or* . . . unduly expensive foundations, retaining walls or unduly expensive measures for waterproofing . . . *or* . . . draining . . . *or* for the prevention of . . . flooding . . . *or* for the protection of adjacent properties . . ." (emphases added). G. L. c. 121A, § 1. See St. 1960, c. 652, § 13, as appearing in St. 1965, c. 859, § 2. See also *Benevolent & Protective Order of Elks, Lodge No. 65* v. *Planning Bd. of Lawrence*, 403 Mass. 531, 540 (1988) (interpreting similar language of c. 121B, § 2, court stated that statute presents "alternative definitions of a 'blighted open area,' " but "area need satisfy only one of these definitions").

The BRA conducted a careful review of the area to determine whether it was blighted, tracking the statutory requirements. The BRA found that the existing parking lot was "a predominantly open area which is detrimental to the . . . sound growth of the community because it is unduly costly to develop it soundly through the ordinary operations of private enterprise." G. L. c. 121A, § 1. The BRA relied on the small and irregular size of the lot[12] and the fact that it had not been developed for decades. The existing buildings were demolished in the 1950's. See *Shriners' Hosp. for Crippled Children* v. *Boston Redev.*

---

[12]The report found that "[a] building with a small footprint requires more expensive exterior wall and window construction and maintenance in proportion to the volume of space which it encloses." It also found that the "percentage of the total footprint of each floor in the Project which must be dedicated to . . . elevators and egress stairs — and to bathrooms and utility rooms . . . is higher than a substantial portion of the first class office space in the City."

*Authy.*, *supra* at 556-557 (focusing on small, irregular site, unused for many years). The BRA also analyzed the different site conditions, all set out in the statute, to support why the lot was unduly costly to develop. It discussed (1) the "existence of . . . unsuitable soil . . . conditions," including that the existing fill material would not support a building and would have to be removed in its entirety; and (2) "the need for unduly expensive foundations, retaining walls or unduly expensive measures for waterproofing structures or for draining the area," because groundwater levels (eleven to fifteen feet below the surface) would require any building excavation to create a groundwater cut-off using expensive slurry walls.[13] The BRA determined that the size of the building and the site conditions made it financially infeasible to develop without c. 121A assistance. We agree with the judge below that there is substantial evidence supporting the BRA's blight determination.

The plaintiff suggests the BRA's articulated findings on blight are inadequate because they simply restate the language provided in the developer's project application. This is not, however, a case in which the BRA rubber stamped the developer's submissions or parroted statutory language. Here, "the findings . . . clearly go beyond a bare repetition of statutory language, and specific reasons underlying the [BRA's] conclusions have been set forth." *Shriners' Hosp. for Crippled Children* v. *Boston Redev. Authy.*, *supra* at 558. Contrary to the plaintiff's assertions, the BRA's report, and the approximately 2,000 pages of supporting documents included in the appendix, provide detailed and ample support for the BRA's determination that the project area is a blighted open area. Although the report substantially adopted the language of the developer's final application, this application was the end result, and in certain respects the work product, of an interactive public process led by the BRA that carefully analyzed and significantly refined the project.

We also reject the argument that the BRA simply concluded

[13]The height of the adjacent historic Hotel Essex building, which would share a wall with the proposed project, also meant that there would be no windows for most of one side of the proposed building, thereby affecting its rental value.

that all parking lots are blighted areas without conducting an individualized inquiry. See generally *Housing & Redev. Authy. of the City of St. Paul* v. *Coleman's Serv., Inc.*, 281 Minn. 63, 69 (1968) (surface parking lots "represent a highly inefficient use of downtown real estate"); *Tierney* v. *Planned Industrial Expansion Authy. of Kansas City*, 742 S.W.2d 146, 151 (Mo. 1987), appeal dismissed, 486 U.S. 1040 (1988) (proper for redevelopment authority to find that "[s]urface parking constitutes a two-dimensional use which inhibits other, more economically intense, uses . . . [and] contribute[s] to a condition of blight"). It is apparent from our review of the record that the BRA combined its general concerns and expertise regarding the urban planning problems presented by surface parking lots with a particular review of the location and lot at issue, which had remained undeveloped for decades and was plagued by site conditions requiring expensive engineering solutions. The required individualized review was undertaken here.

Similarly unavailing is the plaintiff's contention that the parcel in its present condition as a parking lot cannot be detrimental to the sound growth of the community because the Leather District as a whole is already a "vital, vibrant and prosperous" neighborhood. Although the conditions of the district as a whole are relevant, the statute is directed at the project area itself. See G. L. c. 121A, § 1. Nothing in the statute suggests that blighted open areas cannot exist in or near otherwise vibrant neighborhoods. See generally St. 1960, c. 652 (statute not only designed for eliminating blighted conditions but also "preventing the recurrence or redevelopment of such conditions"); *Dodge* v. *Prudential Ins. Co.*, 343 Mass. 375, 384 (1961) (undeveloped project area, which would be used for Prudential Center, "lies in the path of, and interferes with, the sound growth of the city"). Also, courts "will not 'sit in review on the size of a particular project area.' " *Shriners' Hosp. for Crippled Children* v. *Boston Redev. Authy.*, 4 Mass. App. Ct. at 556, quoting from *Berman* v. *Parker*, 348 U.S. 26, 35 (1954).[14]

We are also satisfied that the record supports the BRA's

---

[14]We also note that the site abuts the South Station Urban Renewal Project, "a comparatively large area previously found by the [BRA] to be a blighted

determination that the proposed project represents a public use and benefit. "[T]he determination whether a particular project constitutes a public use and benefit should include an evaluation of both the elimination of blight through construction and the nature of the purposes to be served by the proposed project." *Boston Edison Co.* v. *Boston Redev. Authy.*, 374 Mass. at 61. The "mere building of a new structure in an area that has been determined to be [blighted], with the resultant elimination of the . . . [blight] conditions, is insufficient to constitute such building a public use and benefit." *Ibid.* The building must also be "useful and beneficial to the public." *Id.* at 62. Here, the BRA has given careful consideration to the public benefit that the proposed project represents. The record supports the BRA's determination that the proposed project would create an attractive mixed-use development that would provide office space "sorely needed" at the time. The record also supports the BRA's finding that the project would provide employment during construction and permanent jobs, street-level retail opportunities, underground parking available for neighborhood use to replace the lost surface parking, and completion of the urban streetscape.

2. *Zoning relief.* The plaintiff argues that the BRA lacked substantial evidence to find that the zoning deviations it granted would not substantially derogate from the intent and purpose of the Boston Zoning Code or conflict with the master plan for the city.

The BRA is authorized by St. 1960, c. 652, § 13, as appearing in St. 1965, c. 859, § 2, to grant a deviation, should the proposed project contravene "any zoning, building, health or fire law, code, ordinance or regulation." "The standard for granting [such] a zoning variance . . . , that the deviation will not substantially derogate from the intent and purposes of the zoning code, is very similar to . . . the standards for the grant of a variance from the zoning code under G. L. c. 40A, § 10. However, the power of the BRA to grant variances is less circumscribed than that of the permit granting authority under G. L. c. 40A, § 10, since the exercise of the BRA's authority is

open, decadent, and substandard area." *Shriners' Hosp. for Crippled Children* v. *Boston Redev. Authy.*, 4 Mass. App. Ct. at 556.

conditioned on fulfillment of only this one criterion." *Boston Edison Co.* v. *Boston Redev. Authy.*, *supra* at 64 (footnote omitted). See *Shriners' Hosp. for Crippled Children* v. *Boston Redev. Authy.*, *supra* at 559 ("[T]he standards for granting deviations under [the redevelopment statute] are less restrictive than those governing the granting of variances under the zoning laws").

Article 44 of the Boston Zoning Code "establish[es] the zoning regulations for the comprehensive plan for the Leather District." Boston Zoning Code, art. 44, § 44-1.[15] As provided in § 44-1 of art. 44, "[t]he goals and objectives of this article and the Leather District Plan are to preserve the historic and architectural character of the Leather District; to promote the mixed residential, office, studio, retail and service uses of the Leather District; and to ensure that new development is compatible with existing buildings in scale, design, and choice of building and decorative materials."

Here the proposed development was for commercial office space, a permissible use. Retail opportunities were also planned. The BRA determined that the project incorporated "many significant architectural elements of the Leather District," creating a building that was "sympathetic" to the district. The Massachusetts Historical Commission determined that the project would have "no adverse effect" on the historic, architectural and cultural resources of the district. The primary deviation, and the one that is the focus of the appeal, is the scale of the building.[16] Instead of a 100-foot building with a FAR of 8, the BRA approved a 162-foot building with a FAR of 11.3.

As emphasized by the BRA, the Two Financial Center project underwent intensive and comprehensive review and substantial reduction in height. The BRA determined that the building size and shape ultimately approved did not provide enough rentable space to be financially viable without c. 121A assistance. More

---

[15]The Leather District Plan is separate from, and more conceptual than, art. 44. It is the height restriction in art. 44 that raises the significant issue here.

[16]The BRA allowed deviations from the following sections of art. 44 of the Boston Zoning Code: Section 44-5: As-of-Right Building Height and Floor Area Ratio; Section 44-7: Specific Design Requirements; Section 44-8: Leather District Design Guidelines; and Section 44-10: Leather District Use Regulations.

importantly, the BRA also emphasized the location of the building in its finding of no substantial derogation from the intent and purposes of the zoning code or the Leather District Plan. The project area is on the northern edge of the Leather District. The proposed twelve-story building would be "compatible" in height with its neighbors as it would be located across from the forty-six-story One Financial Center building, and adjacent to the eleven-story Hotel Essex building. As determined by the BRA, Two Financial Center would provide a good transition between the relatively low buildings of the Chinatown District and the high rise buildings of the South Station Area. The Leather District Plan itself states that the "Leather District creates a natural transition" between these two areas.

"In sum, we think that the experience of the BRA in matters involving redevelopment in the city of Boston [including the preparation and implementation of art. 44 and the Leather District Plan], coupled with the evidence before it in this case, permitted the BRA to find that the granting of these deviations would not substantially derogate from the intent and purposes of the zoning code" or conflict with the master plan for the Leather District and city. *Boston Edison Co. v. Boston Redev. Authy., supra* at 70.

*Judgment affirmed.*