## Boston Edison Company vs. Boston Redevelopment Authority & others.

Suffolk. March 8, 1977. — December 21, 1977.

Present: Hennessey, C.J., Quirico, Liacos, & Abrams, JJ.

*Redevelopment of Land. Administrative Matter. Public Board. Practice, Civil*, Extraordinary review, Parties. *Constitutional Law*, Equal protection of laws. *Jurisdiction, Civil*, Redevelopment of land, To try title to public office. *Boston Redevelopment Authority. Contract*, Redevelopment of land. *Zoning. Words*, "Person aggrieved," "Project," "Public utility," "Public use and benefit."

The general principle that harm from expected competition is insufficient to confer standing on a plaintiff was not applicable to an electric company's challenge to the Boston Redevelopment Authority's approval of the construction of an electric generating plant as an urban renewal project since approval of the project would cause a direct and ascertainable loss to the electric company by eliminating a group of consumers from the market available to the company. [43-44] Quirico, J., concurring in the result.

An electric company which would suffer a direct, substantial, and ascertainable loss as the result of the Boston Redevelopment Authority's approval of a project was a "person . . . aggrieved" within the meaning of St. 1960, c. 652, § 13. [44-46] Quirico, J., concurring in the result.

In an action in the nature of certiorari challenging a decision made by the Boston Redevelopment Authority pursuant to its statutory powers under St. 1960, c. 652, and G. L. c. 121A, the scope of judicial review was whether there was substantial evidence to support the authority's decision. [47-54] Quirico, J., concurring in the result.

A corporation's proposed construction of an energy plant and distribution facility intended to serve only its members was a "project" within the meaning of St. 1960, c. 652, and G. L. c. 121A [54-57]; the construction of c. 652 and c. 121A as authorizing such a plan would not violate general principles of public utility policy nor would it conflict with G. L. c. 164, §§ 87 and 88 [54-55]; nor would the proposed facility constitute a "public utility" within the meaning of c. 121A, § 1 [56-57].

The construction of G. L. c. 121A, § 1, to authorize a corporation to construct an energy plant and distribution facility for the use of its members did not deny an electric company equal protection of the laws by the fact that the c. 121A project would receive tax concessions and might be exempt from governmental regulation. [57-58]

A determination by the Boston Redevelopment Authority that the site of a proposed project was in a decadent or sub-standard area within the meaning of G. L. c. 121A, § 1, was supported by substantial evidence. [58-60]

The proposed construction in a decadent area of an energy plant and distribution facility for use by twelve institutions engaged in medical, educational, and charitable functions constituted a "public use and benefit" within the meaning of St. 1960, c. 652, § 13. [60-62]

Substantial evidence supported a finding by the Boston Redevelopment Authority that a proposed power plant to service various medical, educational, and charitable institutions was a commercial and institutional use and not an industrial use. [65-67]

Substantial evidence supported a finding by the Boston Redevelopment Authority that the grant of deviations from the Boston Zoning Code to a corporation for the construction of a power plant to be used to service various medical, educational, and charitable institutions would not substantially derogate from the intent and purposes of the zoning code within the meaning of St. 1960, c. 652, § 13. [63-65; 67-70]

There was no error in a determination by the Boston Redevelopment Authority pursuant to St. 1960, c. 652, § 13, that construction of a power plant to service various medical, educational, and charitable institutions within the Fenway Urban Renewal Area would further the goals and objectives of the Fenway Urban Renewal Plan and would not conflict with the city's Master Plan. [70-72]

The approval by the Boston Redevelopment Authority of a project pursuant to St. 1960, c. 652, and G. L. c. 121A was not rendered invalid by the applicant's failure to disclose on its application the amount of additional payments it would make to the city under the provisions of G. L. c. 121A, § 6A, where the approximate amount of such payments was disclosed at a public hearing and the authority was at a later date, but prior to the approval, informed of the specific amount. [72-74]

A plaintiff in an action to challenge a decision of the Boston Redevelopment Authority could not attack the decision on the ground that the terms of certain members of the authority had expired prior to the vote; a public officer's right to office cannot be attacked collaterally. [74-76]

In an action challenging a decision of the Boston Redevelopment Authority, there was no merit to the plaintiff's claim that St. 1960, c. 652, and G. L. c. 121A were unconstitutionally vague and overbroad. [76]

CIVIL ACTION commenced in the Superior Court on January 13, 1976.

The case was heard by *McNaught*, J., on a motion to dismiss.

The Supreme Judicial Court granted a request for direct appellate review.

*David R. Pokross* (*Robert H. Quinn* with him) for the plaintiff.

*Robert W. Meserve* for President and Fellows of Harvard College & others (*Edward J. Lonergan*, Assistant General Counsel, for Boston Redevelopment Authority, with him).

ABRAMS, J. Pursuant to St. 1960, c. 652, § 13, the plaintiff Boston Edison Company (Edison) instituted a proceeding in the nature of certiorari in the Superior Court to review action taken by the defendant Boston Redevopment Authority (BRA) under its statutory powers as set out at St. 1960, c. 652, and G. L. c. 121A. The specific action which Edison attacks is the BRA's approval of a plan proposed by the remaining defendants — (1) Citicorp Translease, Inc.; (2) L. Edward Lashman, Jr.; (3) the Medical Area Service Corporation (MASCO); and (4) the President and Fellows of Harvard College (Harvard) (collectively the Applicants) — for the construction of an electric generating and steam power plant, an office building, and related facilities as an urban renewal project. A Superior Court judge heard arguments on two motions to dismiss, one filed by the BRA and the other by the Applicants. Each of the motions to dismiss alleged that Edison lacked standing to maintain its cause of action. Both motions also alleged in substance that the complaint failed to state a claim on which relief could be granted. The judge denied the motions challenging Edison's standing. Thereafter, after a full hearing, the judge rendered a thorough and well-reasoned opinion which at its conclusion ordered that a judgment dismissing Edison's complaint (and thereby affirming the BRA's action) should be entered. Edison duly filed its claim of appeal. We allowed Edison's application for direct appellate review. The defendants did not take a cross appeal from the

judge's adverse ruling on the standing issue. We affirm the decision of the Superior Court judge.

The facts are as follows. MASCO is a charitable corporation established by twelve institutions engaged in medical, educational, and charitable functions.[1] MASCO's purpose is to assist its members in performing these functions more efficiently.

The project contemplates the operation and maintenance by MASCO, through a corporation formed pursuant to c. 652 and G. L. c. 121A, of a total energy plant which would provide electricity, steam, chilled water, and solid waste incineration for the MASCO member institutions.[2] The total energy plant would replace the existing Harvard steam plant on Blackfan Street, which presently supplies some of the steam requirements of some of the MASCO institutions but which is or will be increasingly inadequate to meet these requirements. In addition, the project would provide some nonelectrical services, free of charge, to the Mission Park Housing Project, a publicly assisted housing project previously approved by the BRA.[3]

The power plant is to be located on 1.4 acres in the city of Boston in a block bounded by Brookline Avenue, Francis Street, Binney Street, and Peabody Street. This area is located within the Fenway Urban Renewal Area and is sub-

---

[1] MASCO's membership consists of the following institutions: The Affiliated Hospitals Center (consisting of Boston Hospital for Women, Peter Bent Brigham Hospital, and Robert B. Brigham Hospital), Beth Israel Hospital, Children's Hospital Medical Center, Sidney Farber Cancer Center, New England Deaconess Hospital, Joslin Diabetes Foundation, Massachusetts College of Pharmacy, as well as Harvard Medical School, Harvard School of Dental Medicine, and Harvard School of Public Health.

[2] Although MASCO is the corporation in charge of the project, the record and exhibits indicate that Harvard is primarily responsible for the commencement, development, and implementation of the project.

[3] The BRA could not require this service as a condition of approving the project. See *Middlesex & Boston St. Ry.* v. *Aldermen of Newton,* 371 Mass. 849, 858 (1977). There is no evidence in the record indicating that the BRA's approval was so conditioned.

ject to the Fenway Urban Renewal Plan (Fenway Plan); approval of the Fenway Plan required a finding that the Fenway Urban Renewal Area was a decadent area. The area surrounding the site of the proposed power plant is characterized by institutional and commercial uses on three sides and by some residential use on the fourth side.

Edison sells electricity in the city of Boston, and among its customers are the twelve MASCO member institutions whose annual consumption yields to Edison approximately $3,000,000 in gross revenues. Construction of the total energy plant will result in Edison's loss of this business for a period of at least thirty-five years.

After informal contact between the Applicants and the BRA regarding the likelihood of the plan's qualifying as a project under St. 1960, c. 652, and G. L. c. 121A, the BRA on April 30, 1975, submitted a draft environmental impact report (EIR) on the project. The Applicants submitted to the BRA a formal application for approval of the project on July 1, 1975. On July 7, 1975, the Secretary of Environmental Affairs issued a statement finding the draft EIR inadequate.

On August 26, 1975, the BRA conducted a public hearing on the project, as required by c. 121A. Edison participated fully in this hearing and filed with the BRA extensive materials setting forth its views on the proposed project.

On September 29, 1975, the BRA submitted its final EIR. On October 2, 1975, a motion to adopt a draft Report and Decision approving the project was tabled, but on October 9, 1975, by a four to one vote, the BRA adopted a Report and Decision approving the project. Included in the report were the findings required for approval of a project under St. 1960, c. 652, and G. L. c. 121A. The BRA's vote was approved by the mayor of the city of Boston on December 8, 1975, and on December 17, 1975, copies of the BRA's vote and the mayor's approval were filed with the city clerk.

On November 5, 1975, the Secretary of Environmental Affairs found the final EIR inadequate. After the submis-

sion of supplementary information, the EIR was found acceptable by the Secretary on January 23, 1976.[4]

Edison challenges the BRA's approval of the project on the grounds (1) that the total energy plant does not constitute a "project" as defined in G. L. c. 121A, § 1; (2) that, contrary to the BRA's findings, the site for the plant was not a "decadent and/or substandard area," and the project does not constitute a "public use and benefit" as required by c. 652, § 13, and c. 121A, §§ 1 and 2; (3) that deviations from the Boston zoning code granted by the BRA substantially derogate from the intent and purposes of the zoning code; (4) that the plan conflicts with the Master Plan for Boston and with the Fenway Plan; (5) that the vote of the BRA is invalid because the failure to disclose the amount of the additional tax payment on the project is a violation of G. L. c. 121A, § 6A; and (6) that the terms of four of the five BRA members who voted on the application had expired prior to the vote, thus rendering that action invalid.

Prior to examining the merits of these allegations, we confront the defendants' threshold claim that Edison is without standing to maintain the present suit. That argument was advanced in the Superior Court as a basis for the defendants' motions to dismiss. The motions were denied. Al-

---

[4]The Superior Court judge ruled that G. L. c. 30, § 62, governed review of Edison's claim that the BRA erred in voting to approve the project at a time when there was no adequate final EIR. Edison has not challenged that ruling in this court. Consequently this issue is not before us. *Board of Appeals of Maynard* v. *Housing Appeals Comm.*, 370 Mass. 64, 68 (1976). *Mister Donut of America, Inc.* v. *Kemp*, 368 Mass. 220, 224-225 (1975). Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 919 (1975). We express no views concerning the merits of this issue or Edison's standing to challenge it.

In the Superior Court, Edison also challenged the BRA's action on the additional grounds (1) that the project would be detrimental to the best interest of the public, in contravention of St. 1960, c. 652, § 13, and (2) that the failure to allow Edison to undertake its own interior inspection of buildings at the site of the proposed project deprived it of due process. These points also were not briefed or argued before this court and thus are not before us. See Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 919 (1975).

though the defendants did not take a cross appeal from that ruling, they are not precluded from raising it here. A party who prevails in the Superior Court may present on appeal any ground which was previously asserted below in support of the judgment.[5] *Boston Police Patrolmen's Ass'n* v. *Boston,* 367 Mass. 368, 373-374 (1975). We therefore address this matter at the outset.

1. *Standing.*

Statute 1960, c. 652, § 13, provides that "any person . . . who is aggrieved" by a vote of the BRA may file a petition for a writ of certiorari against the authority to correct errors of law. Edison contends that its projected loss of approximately $3,000,000 a year over the next thirty-five years is an injury of sufficient magnitude to confer standing on it. The defendants argue, on the other hand, that business competition as the result of governmental action is not the type of injury which satisfies the standing requirement of the statute.

As the defendants maintain, the threat of competition is generally not a sufficient injury to confer standing. *SDK Medical Computer Servs. Corp.* v. *Professional Operating Management Group, Inc.,* 371 Mass. 117, 123-124 (1976). *Nantucket Boat, Inc.* v. *Woods Hole, Martha's Vineyard & Nantucket S.S. Auth.,* 345 Mass. 551, 554 (1963). *Springfield Hotel Ass'n* v. *Alcoholic Beverages Control Comm'n,* 338 Mass. 699, 703 (1959). *Colantuoni* v. *Selectmen of Belmont,* 326 Mass. 778, 779-780 (1951). *Circle Lounge & Grille, Inc.* v. *Board of Appeal of Boston,* 324 Mass. 427, 429 (1949). However, the cases in which this proposition has been established and applied are distinguishable from the instant case. In those cases the plaintiffs challenged decisions allowing the operation of establishments similar to

---

[5] Although a party may defend a judgment on any ground asserted in the trial court, failure to take a cross appeal precludes a party from obtaining a judgment more favorable to it than the judgment entered below. See *M.L. Shalloo, Inc.* v. *Ricciardi & Sons Constr., Inc.,* 348 Mass. 682, 684 (1965); *Turgeon* v. *Turgeon,* 330 Mass. 402, 409 (1953); *Todd* v. *Foster,* 328 Mass. 136, 140 (1951).

their own which would compete with them for business and thus possibly deprive them of revenue. The injury to Edison, however, does not involve such a speculative loss of business through increased competition. Rather, the approval of the project by the BRA would cause a direct and ascertainable loss to Edison, and this loss would not be the result of competition for customers but would stem from the elimination of a group of consumers from the market available to Edison. Thus while we think the question of Edison's standing is a close one, we conclude that the general principle that harm from expected competition is insufficient to confer standing is inapplicable. Compare *American Can Co. v. Milk Control Bd.*, 313 Mass. 156 (1943), with *Circle Lounge & Grille, Inc. v. Board of Appeal of Boston, supra.*

We therefore turn to the law concerning the construction of "person aggrieved" to determine whether Edison has standing to maintain this action. "The scope and meaning of the words 'person . . . aggrieved' must be determined with reference to the context and the subject matter." *Ayer v. Commissioners on Height of Bldgs. in Boston,* 242 Mass. 30, 33 (1922). In considering the grant of standing of c. 652, § 13, we have previously stated that the "words 'persons aggrieved' are to be given a comprehensive meaning." *Dodge v. Prudential Ins. Co. of America,* 343 Mass. 375, 381 (1961). We have not, however, had occasion to consider that statutory phrase in light of facts such as those presently before us.

In determining the scope of a statute granting standing to a "person aggrieved," our inquiry focuses on (1) the powers of the administrative body as defined in the statute, and (2) the manner in which the statute directs that those powers be exercised. *American Can Co. v. Milk Control Bd., supra* at 158. If the agency's power is great, and if the relevant statute contemplates a consideration of public opinion in the decision making process, then a fairly expansive conception of standing obtains. In such a situation an "ascertainable property loss [suffered] as a proximate consequence of the . . . [agency] action" standing alone suffices to meet

the requirement that the person seeking review be "aggrieved." *American Can Co.* v. *Milk Control Bd., supra* at 160.

Chapter 121A was enacted in response to a legislative determination that the continued existence of blight and decay posed a threat to the health and safety of the inhabitants of the Commonwealth. The Legislature concluded that such conditions constituted a public exigency and that their elimination would be in the public interest. G. L. c. 121A, § 2. Accordingly the Legislature granted broad powers to the BRA and to similar bodies throughout the Commonwealth. See G. L. c. 121A and St. 1960, c. 652. The BRA possesses, inter alia, the power to approve plans involving the demolition of existing buildings and the resultant displacement of large numbers of persons and functioning enterprises, St. 1960, c. 652, § 13; and the power to grant exemptions from taxation, St. 1960, c. 652, § 12, and G. L. c. 121A, § 10.

These are "extraordinary powers," the exercise of which is "bound to affect profoundly many persons not directly concerned" in the construction of the redevelopment projects. *American Can Co.* v. *Milk Control Bd., supra* at 158-159. "Such powers . . . [are] capable of grave abuse." *Id.* at 159.

Further, the procedural provisions of the statute call for wide-scale public participation. When a private redevelopment plan is submitted, the BRA is required to give notice and to conduct a public hearing on the project. St. 1960, c. 652, § 13. Among the purposes of the hearing is the furnishing of the BRA with a reservoir of information so that it can determine whether the approval of the project "would be in any way detrimental to the best interests of the public. . . ." *Id.* The BRA must also prepare and make available to the public a report setting forth the reasons for its approval or disapproval of the proposed project. *Id.* Any person aggrieved by the agency's action may seek judicial review "whether previously a party to the proceeding or not." *Id.*

Having in mind the broad powers granted to the BRA, the far-reaching effects of actions taken pursuant to its approval, the provisions for public participation, and the comprehensive provision for review, we conclude that the grant of standing contained in St. 1960, c. 652, § 13, is sufficiently broad to allow for review by a person who alleges a substantial injury as a direct result of the BRA's action. See *American Can Co.* v. *Milk Control Bd., supra* at 160. The loss which Edison will undoubtedly suffer as a result of the BRA's approval of the project is direct, substantial, and ascertainable. Thus we conclude that Edison is a "person . . . aggrieved" within the meaning of St. 1960, c. 652, § 13.

We recognize that difficult questions may arise as to whether an alleged injury meets this standard. We are also aware that in many, if not most, circumstances, the injury complained of may be too remote to make the party seeking review a "person aggrieved." But that is not the case before us.[6]

While we grant Edison standing on many aspects of this appeal, when an issue involves an area of law governed by a specific statute with a standing requirement, that issue is governed by the standing requirements of the particular statute and not by a general grant of standing such as in this case. See, e.g., G. L. c. 23B, § 23; c. 30, §§ 61 and 62; c. 40A, § 17, as appearing in St. 1975, c. 808, § 3 (formerly c. 40A, § 21). See also *Shriners' Hosp. for Crippled Children* v. *Boston Redevelopment Auth.,* 4 Mass. App. Ct. 551 (1976). Cf. *Sierra Club* v. *Morton,* 405 U.S. 727, 734-741 (1972); *United States* v. *Students Challenging Regulatory Agency Procedures,* 412 U.S. 669, 683-690 (1973).

2. *Scope of Review.*

Having concluded that Edison may maintain the present action, we proceed to examine the merits of its various argu-

---

[6] Persons other than Edison intervened in the Superior Court proceedings, but for reasons unknown to us none of the interveners perfected an appeal to this court.

ments challenging the validity of the BRA's vote. Before do-
ing so, however, we shall delineate the scope of judicial
review of BRA proceedings.

Statute 1960, c. 652, § 13, provides that a person ag-
grieved by a vote of the BRA "may file a petition in the
supreme judicial or superior court sitting in Suffolk County
for a writ of certiorari against the authority to correct errors
of law therein; and the provisions . . . of section four of
chapter two hundred and forty-nine, of the General Laws,
shall apply to said petition. . . . The remedy provided by
this paragraph shall be exclusive." At the time of the enact-
ment of St. 1960, c. 652, G. L. c. 249, § 4, provided in perti-
nent part: "It shall be open to the petitioner to contend at
the hearing upon the petition [for certiorari] that the
evidence which formed the basis of the action complained
of or the basis of any specified finding or conclusion was as
matter of law insufficient to warrant such action, finding or
conclusion."[7] The writ of certiorari was abolished by Mass.

---

[7]The text of G. L. c. 249, § 4, at the time of the enactment of St. 1960,
c. 652, was as follows:
"A petition for a writ of certiorari to correct errors in proceedings
which are not according to the course of the common law may be
presented to a justice of the supreme judicial court, and he may, after
notice, hear and determine the same. It shall be open to the petitioner to
contend at the hearing upon the petition that the evidence which formed
the basis of the action complained of or the basis of any specified finding
or conclusion was as matter of law insufficient to warrant such action,
finding or conclusion. The writ shall not be issued unless the petition
therefor is presented within two years next after the proceedings com-
plained of. It may be issued from the clerk's office in any county and shall
be returnable as the court orders. The court at any time after the petition
is presented may impose costs upon any party, may issue an injunction
and may order the proceedings brought up; and, after they are brought
up, may quash or affirm them, or may make such order, judgment or
decree as law and justice may require. The powers conferred by the
foregoing sentence shall apply also to a petition for a writ of mandamus
and to an amended petition for either a writ of certiorari or a writ of man-
damus under section one C of chapter two hundred and thirteen, subject
in case of appellate proceedings, to the authority of the supreme judicial
court to suspend the operation of any judgment or decree and to amend
any order pending such appellate proceedings as is provided in equity by

R. Civ. P. 81 (b), 365 Mass. 841 (1974). In accordance with this change, St. 1973, c. 1114, § 289, amended G. L. c. 249, § 4, by changing the nomenclature of the proceedings for review. The former version of § 4 referred to the proceeding as "a petition for a writ of certiorari," while the latter version used the term a "civil action in the nature of certiorari." Further, St. 1973, c. 1114, § 289, deleted the provision relating to the right of the petitioner to attack any findings or conclusions on the basis that they were not supported by sufficient evidence.

The defendants argue that the amendment to c. 249, § 4, which omitted insufficient evidence as a basis for challenging the administrative action, substantially narrowed the scope of review in a proceeding under c. 652, § 13. They claim that the standard for review is "whether findings lack any basis or foundation or are made in an arbitrary or capricious manner." Edison, on the other hand, contends that the scope of review under c. 652, § 13, was not altered by the 1973 amendment to c. 249. Thus, it claims that an avenue remains open for it to attack the findings of the BRA on the ground that they are not supported by sufficient evidence. Further, relying on *Boston Edison Co. v. Selectmen of Concord,* 355 Mass. 79 (1968), it claims that the insufficient evidence standard is similar to the "substantial evidence test." See G. L. c. 30A, § 14 (8) (e).

We agree with Edison as to the proper scope of review. We shall evaluate the BRA's actions under c. 121A by applying the substantial evidence test. Although St. 1973, c. 1114, § 289, which amended c. 249, § 4, did omit the provision allowing challenges based on insufficient evidence, we conclude that this statute was not intended to affect the scope of review accorded this type of project.

section twenty-two of chapter two hundred and fourteen." As amended by St. 1943, c. 374, § 1; St. 1953, c. 586, § 1.

Statute 1960, c. 652, § 13, directs that the time provision of c. 249, § 4, shall not apply in a certiorari proceeding instituted pursuant to c. 652, § 13.

Rather, the primary purpose of the amendment was to conform the General Laws to the Massachusetts Rules of Civil Procedure, which abolished the writ of certiorari and established that there is to be "one form of action." Mass. R. Civ. P. 81 (b), 365 Mass. 841 (1974), and Rule 2, 365 Mass. 733 (1974). The deletion of the provision permitting challenges based on insufficiency of the evidence, the only statutory provision concerning judicial review in connection with a writ of certiorari, was designed to permit the appropriate scope of review to be tailored to the substance of the complaint. See Note, Rule 80B and Nonstatutory Judicial Review of Administrative Action in Maine, 23 Me. L. Rev. 419 (1971).

The abolition of the writ of certiorari, which the Reporter for the rules termed the burial of an antique, and the availability in a "civil action" of the relief previously sought through the writ indicate an intention not to carry over intact all the special doctrines surrounding writs. See *Stetson v. Selectmen of Carlisle,* 369 Mass. 755, 758 (1976). See generally Note, Rule 80B, *supra.* We are not inclined to reintroduce prior technicalities under the guise of an analysis of scope of review.[8] See 3 K.C. Davis, Administrative Law § 24.01 (1958); Carrow, Types of Judicial Relief from Administrative Action, 58 Colum. L. Rev. 1, 1-2 (1958); Note, Rule 80B, *supra.* Thus we do not look to the historic practice under the writ of certiorari in considering the scope of judicial review. Rather, we determine that the proper approach in considering the appropriate scope of review is to evaluate the nature of the action sought to be reviewed. See

---

[8]Edison also challenged in the lower court the inclusion in the BRA's return of the statement of proceedings which contained additional reasons for the BRA's actions and which was filed by the BRA after the commencement of litigation. Edison's brief mention of this issue in its argument to this court is insufficient to bring this issue properly before us. See Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 919 (1975). While we do not consider the merits of this argument, we note that under the rules of civil procedure a return is now an answer, see Mass. R. Civ. P. 7 (a), 365 Mass. 748 (1974); *Stetson v. Selectmen of Carlisle,* 369 Mass. 755, 758 (1976).

*Sherman v. Rent Control Bd. of Brookline,* 367 Mass. 1, 9-10 (1975).

The characteristics of a c. 121A urban renewal project and the statutory procedures for approval of such a project lead us to conclude that the substantial evidence test is the appropriate standard. The features of c. 121A projects, both when considered independently and when compared with those of c. 121B projects, indicate that the broader scope of review provided by the substantial evidence test, rather than the "arbitrary and capricious" standard, is appropriate.

Projects approved under c. 121A are privately planned and initiated and are privately owned throughout their existence. See G. L. c. 121A, § 3. Such projects, because they serve public purposes, are subsidized by grants of tax concessions. G. L. c. 121A, § 10. If these projects are to be constructed in Boston, they are only subject to review and approval by the BRA and the mayor of the city of Boston. St. 1960, c. 652, § 12. Thus, although there is some measure of supervision and participation by a public agency, urban renewal projects under c. 121A are primarily conceived of and implemented by the private corporations which will operate them. Further, these projects receive large public benefits. When such benefits are provided to private groups which are not subject to much control or supervision by a public agency, we believe that the broader scope of review provided by the substantial evidence test is required. See *Dodge v. Prudential Ins. Co. of America,* 343 Mass. 375, 381-382 (1961); *Opinion of the Justices,* 341 Mass. 760, 777-778 (1960).

Moreover, the statutory provisions and the BRA regulations governing the approval of projects under c. 121A indicate an awareness of the need for detailed consideration of the interests of those affected by the approval of a c. 121A project. The BRA is required under c. 652, § 13, to give public notice and to hold a public hearing before approving a project. The internal regulations of the BRA contain detailed guidelines concerning, inter alia, the admission of

evidence and representation by counsel. BRA Rules and Regulations, § 9. Under c. 652, § 13, the BRA must prepare and make open to public inspection a written report containing the reasons for its decision regarding a project. Finally, § 13 expressly provides for judicial review of agency action.[9] Thus, our conclusion as to the appropriate scope of review is supported by the statutory framework concerning privately initiated projects. Our decision is in accord with a legislative awareness of the need for detailed appraisal of private projects by groups other than the public authorities involved.

The defendants argue, however, that under our prior cases dealing with urban redevelopment projects, the findings involved in the present case are "legislative" and thus review of them is governed by the "arbitrary and capricious" standard. *Reid* v. *Acting Comm'r of the Dep't of Community Affairs*, 362 Mass. 136, 142-143 (1972). *Moskow* v. *Boston Redevelopment Auth.*, 349 Mass. 553, 561 (1965), cert. denied, 382 U.S. 983 (1966). *Worcester Knitting Realty Co.* v. *Worcester Hous. Auth.*, 335 Mass. 19, 21 (1956). *Bowker* v. *Worcester*, 334 Mass. 422, 434 (1956). *Despatchers' Cafe Inc.* v. *Somerville Hous. Auth.*, 332 Mass. 259, 261-262 (1955). *Stockus* v. *Boston Hous. Auth.*, 304 Mass. 507, 509-510, 511 (1939).

These cases, however, do not control our decision in the present case. These decisions all involved redevelopment

---

[9] As noted above, when it was enacted, § 13, through its incorporation of c. 249, § 4, allowed challenges alleging that insufficient evidence existed to support the agency's findings. The insufficient evidence standard of c. 249, § 4, has been equated with the substantial evidence test. *Boston Edison Co.* v. *Selectmen of Concord*, 355 Mass. 79, 92 (1968). Thus, at least prior to the amendment of c. 249, § 4, § 13 authorized the use of the substantial evidence test. Since we have concluded that the proper approach to determine the appropriate standard of review is to consider the nature of the action concerning which review is sought, we do not rest our conclusion that the substantial evidence test establishes the proper scope of review on the fact that this test was permitted under § 13. However, the fact that the authors of the legislation concerning the BRA initially adopted this test further evidences their concern that greater scrutiny be accorded c. 121A projects.

projects under G. L. c. 121B, its predecessor statutes, or analogous public housing legislation.[10] The differences in the nature of the projects and the methods for approval between redevelopment plans under c. 121A and those under c. 121B support our determinations that different treatment in terms of scope of review is appropriate and that agency action taken in connection with c. 121A projects should be subject to a broader scope of review.

Unlike projects under c. 121A, urban redevelopment projects conducted under c. 121B are initiated and supervised by public agencies. In general, a project under c. 121B involves the establishment and effectuation by the appropriate governmental bodies of an urban renewal plan for a general area, the plan often being in conformity with Federal standards. The plan is initiated by the local redevelopment authority and must be approved by the city council and an independent State agency, the Department of Community Affairs. After securing approval, the local redevelopment authority may then undertake the project by acquiring, clearing, and redeveloping the parcels involved and by initiating other urban renewal activity. See G. L. c. 121B, §§ 46-48. Moreover, again unlike projects con-

---

[10]The defendants particularly rely on the cases of *Reid* v. *Acting Comm'r of the Dep't of Community Affairs*, 362 Mass. 136 (1972), and *Moskow* v. *Boston Redevelopment Auth.*, 349 Mass. 553 (1965), to support their contention that the scope of review is provided by the arbitrary and capricious standard. In our view, these decisions are distinguishable from the present case since both cases involved publicly initiated projects. *Reid* involved a project under c. 121B. A hearing on the project was required by c. 121B, § 48, because more than twenty-five taxpayers had requested such a hearing. The sole issue before the court was whether this hearing was an adjudicatory proceeding, as defined in G. L. c. 30A, § 1 (1). The court concluded that it was not adjudicatory because c. 121B, § 48, did not require that a decision on the project be made after the hearing. *Moskow* involved a publicly initiated project under c. 121, §§ 26WW-26BBB; the subject matter of these sections, which have been repealed by St. 1969, c. 751, § 2, is now covered in c. 121B. The court refused to invalidate the BRA's taking of a parcel of land in connection with a redevelopment project largely because the plaintiff's bill did not contain sufficiently specific allegations to state a claim for which relief could be granted.

ducted under c. 121A, no public benefits in the form of tax concessions are provided to private interests which may become involved in c. 121B projects. See c. 121B, § 16. The large amount of participation by public agencies, together with the absence of tax benefits for interested private groups, differentiates these publicly initiated projects from projects conducted under c. 121A. Because there is less participation by public bodies in connection with c. 121A projects and because there are large tax benefits involved with such plans, a broader scope of review than that accorded agency action in connection with publicly initiated plans is required. Since review of decisions involving publicly initiated plans is governed by the "arbitrary and capricious" standard, application of the substantial evidence test to privately initiated plans is appropriate.

Moreover, the statutory provisions governing approval of these publicly initiated projects do not provide the number of procedural safeguards contained in c. 652, § 13. Proceedings before the Department of Community Affairs in approving publicly initiated projects under c. 121B do not require notice or a public hearing unless a public hearing by the department is requested by the municipality involved or by twenty-five taxpayers. G. L. c. 121B, § 48. There is also no express statutory provision for judicial review of the action of the department. The absence of these provisions, when compared with their presence in c. 652, § 13, indicates a legislative scheme providing for less judicial scrutiny when publicly initiated projects are involved. Thus our decision to apply the substantial evidence test to c. 121A projects is supported by a consideration of the entire statutory framework.

Further, the use of the substantial evidence standard is consistent with a developing tendency to review in more depth the decisions of urban renewal agencies. See Daye, Role of the Judiciary in Community Development and Housing: A Suggested Analytical Method, 52 J. Urban Law 689 (1975); McGee, Urban Renewal in the Crucible of Judicial Review, 56 Va. L. Rev. 826 (1970).

The substantial evidence test is commonly understood to require that agency findings must rest upon "such evidence as a reasonable mind might accept as adequate to support a conclusion." See, e.g., *Bunte* v. *Mayor of Boston,* 361 Mass. 71, 74 (1972). Review under the standard entails scrutiny of the whole record to determine whether substantial evidence exists. See, e.g., *Cohen* v. *Board of Registration in Pharmacy,* 350 Mass. 246, 253 (1966).

The substantial evidence test, with these generally accepted components, thus establishes the scope of review which we shall accord to the BRA's action in the present case.

3. *Determination that the Proposed Plan Is a "Project."*

Edison maintains that the BRA erred in finding that the proposed plan was a "project" within the meaning of G. L. c. 121A, and St. 1960, c. 652. Edison argues that construing c. 121A and c. 652 as authorizing the construction and operation of the total energy plant would violate general principles of public utility policy. The argument rests on the assertion that since the draft contract between MASCO and the city of Boston obligates the city to grant various permits which may be required in connection with the proposed plan, approval of the plan as a project would result in the circumvention of the carefully drafted regulatory scheme for the distribution of electric power, particularly as it is expressed in G. L. c. 164, §§ 87 and 88.

General Laws c. 164, § 87, provides that: "In a town where a person is engaged in the manufacture or sale of electricity, no other person shall lay, erect, maintain or use, over or under the streets, lanes and highways of such town, any wires for the transmission of electricity except wires used by street railway companies for heat or power, without the consent of the aldermen or selectmen granted after notice to all parties interested and a public hearing." [11] Ac-

---

[11] General Laws c. 164, § 88, provides: "Any person aggrieved by the decision of the aldermen or selectmen, under . . . [the preceding section], may, within thirty days after notice of said decision, appeal therefrom to

cording to the terms of the draft contract, the city of Boston has obligated itself and its appropriate boards "under Section 14 of Chapter 121A . . . to grant such licenses, permits or approvals as may be required in connection with the construction, maintenance and operation of the Distribution System as described in the Application."

The argument that approval of the plan would result in a conflict with c. 164 is without merit. Neither the BRA nor the city of Boston possesses the requisite authority to deviate from the provisions of c. 164, § 87 or § 88. The Applicants, as they concede, are bound to comply with these provisions, to the extent that they are applicable. If the contractual provision were aimed at eliminating the need for such compliance, it could not be given effect. However, this contractual obligation apparently relates to the BRA's power to grant permission to deviate from zoning, building, health, and fire regulations. St. 1960, c. 652, § 13.

Edison next argues that G. L. c. 121A cannot be construed in such a way as to include the total energy plant within the definition of "project." In pertinent part, G. L. c. 121A, § 1, defines "project" as "any undertaking consisting of the construction in a blighted open, decadent or sub-standard area of decent, safe and sanitary residential, commercial, industrial, institutional, recreational or governmental buildings. . . . A 'project' may include as incidental thereto . . . (d) installation, construction, and reconstruction of public and private ways, public utilities and services, and site improvements essential to the preparation of a blighted open, decadent or sub-standard area for beneficial development or redevelopment." [12]

the . . . [Department of Public Utilities], which shall thereupon give due notice and hear all parties interested, and its decision shall be final."

[12] The full definition of a "project," as set out in G. L. c. 121A, § 1, is: ". . . any undertaking consisting of the construction in a blighted open, decadent or sub-standard area of decent, safe and sanitary residential, commercial, industrial, institutional, recreational or governmental buildings and such appurtenant or incidental facilities as shall be in the

The BRA found that the proposed power plant, related office building, and other incidental facilities constituted commercial and institutional facilities and thus that they fell within the definition set out in c. 121A, § 1. Edison, however, argues that the statutory definition does not encompass the proposed plan because MASCO intends to erect and maintain a "public utility" and such a facility may be approved only when it is "incidental" to an otherwise valid redevelopment project.

The total energy plant cannot properly be characterized as a public utility.[13] As commonly used, a "'public utility' is a business or service which is engaged in regularly supplying the public with some commodity or service of public consequence, such as electricity, gas, [or] water. . . ." 64 Am. Jur. 2d, Public Utilities § 1, at 549 (1972). If a corporation furnishes such services to its members, the general test used in determining if it is a public utility is whether it serves or is willing to serve the entire public within the area in which its facilities are located. If the corporation confines its service to its own members and does not serve or hold itself out as willing to serve the public, it is not a public utility. See *Alabama Power Co.* v. *Cullman County Elec. Membership Corp.*, 234 Ala. 396, 401 (1937); *Cherry Lake, Inc.* v.

---

public interest, and the operation and maintenance of such buildings and facilities after construction. A 'project' may include as incidental thereto any one or more of the following: — (a) acquisition and assembly of the land (and buildings and structures and other improvements thereon, if any) within a blighted open, decadent or sub-standard area; (b) clearance of the land within a blighted open, decadent or sub-standard area; (c) acquisition, assembly and clearance of land, buildings or structures not in themselves blighted, decadent, or sub-standard if their inclusion is necessary for the clearance, redevelopment, reconstruction or rehabilitation of a blighted open, decadent or sub-standard area; and (d) installation, construction, and reconstruction of public and private ways, public utilities and services, and site improvements essential to the preparation of a blighted open, decadent or sub-standard area for beneficial development or redevelopment."

[13] Nothing in the record indicates that the Blackfan Street power plant, which serviced some of the proposed consumers of the total energy plant, was considered a "public utility."

*Kearce,* 157 Fla. 484, 490-491 (1946); *Schumacher* v. *Railroad Comm'n,* 185 Wis. 303, 306 (1924). The proposed project will service only a specifically identified group of consumers, the MASCO member institutions and the public housing project. MASCO will not offer its services to any other person or institution. Therefore the total energy plant cannot be considered a "public utility," and the argument that the project could only be approved as incidental to another redevelopment project must fail.

Further, while earlier redevelopment statutes restricted their definition of projects to the construction or rehabilitation of housing, see St. 1945, c. 654, § 1; St. 1953, c. 647, § 1, the Legislature, in enacting the present statute, chose to utilize language encompassing a far wider variety of redevelopment plans. The definition now contained in c. 121A, § 1, is sufficiently broad to cover the proposal presently before us. The BRA found that the total energy plant and its related facilities constituted commercial and institutional buildings; the definition of a "project" specifically includes construction of such buildings. Even if Edison's characterization of the plant as industrial were to be accepted for the purposes of this argument only, the present proposal is still a project within the statutory definition. The construction of industrial buildings is also specifically included within the definition of a "project."

When the total energy plant becomes operational, it will, to a limited extent, be engaged in activities similar to those engaged in by Edison — the production and distribution of electric power. Edison maintains that the approval of the project violates the equal protection clause of the Fourteenth Amendment to the United States Constitution because, while Edison is subject to governmental regulation and taxation, the total energy plant would be exempt from such regulation[14] and would receive tax concessions.

---

[14]Whether the Department of Public Utilities considers that it has a regulatory function over utility projects which serve a limited number of consumers rather than the general public is not raised by this proceeding. The Department of Public Utilities is not a party to this proceeding and

The equal protection clause does not prevent reasonable classification of subjects of legislation. *Opinion of the Justices,* 341 Mass. 760, 781 (1960). The difference in the legislative treatment, however, must be reasonably related to a legitimate public purpose. *Commonwealth* v. *Henry's Drywall Co.,* 366 Mass. 539, 545 (1974). *McGinnis* v. *Royster,* 410 U.S. 263, 270 (1973). We have previously stated that redevelopment pursuant to G. L. c. 121A "is a public purpose." *Opinion of the Justices,* 334 Mass. 760, 763 (1956).

Further, we find that a rational basis exists for any difference in treatment accorded Edison and the total energy plant in the matters of governmental regulation and taxation. Edison is a public corporation which is obliged to sell electric power to the community at large. The MASCO total energy plant, on the other hand, will only supply the energy requirements of its member institutions and the nonelectrical needs of a previously approved public housing project. Moreover, the proposed project is located within an area of the community which has been determined to qualify for redevelopment. Thus Edison's equal protection claim must fail. See *First Nat'l Bank* v. *Attorney Gen.,* 371 Mass. 773, 793-794 (1977); *San Antonio Independent School Dist.* v. *Rodriguez,* 411 U.S. 1, 44-45 (1973).

4. *Conclusions that the Proposed Site Is in a Decadent and/or Substandard Area and that the Proposed Project Constitutes a Public Use and Benefit.*

Statute 1960, c. 652, § 13, provides that when an application for a privately initiated redevelopment project in the city of Boston is submitted to the BRA, the Authority, after notice and hearing "shall . . . make such determinations as may be required by the provisions of . . . chapter one hundred and twenty-one A." A major determination required by c. 121A is that the proposed site for such a project is in a

has not had the opportunity to express its views on its functions. Thus, we do not reach or decide this issue.

"blighted open, decadent or sub-standard area." G. L. c. 121A, § 1. The BRA found that the area in which the proposed total energy plant is to be located is "decadent and/or sub-standard." Edison argues that this finding is erroneous because it is not supported by substantial evidence. We disagree.

General Laws c. 121A, § 1, provides the following definitions: "'Decadent area,' an area which is detrimental to safety, health, morals, welfare or sound growth of a community because of the existence of buildings which are out of repair, physically deteriorated, unfit for human habitation, or obsolete, or in need of major maintenance or repair, or because much of the real estate in recent years has been sold or taken for non-payment of taxes or upon foreclosure of mortgages, or because buildings have been torn down and not replaced and in which under existing conditions it is improbable that the buildings will be replaced, or because of a substantial change in business or economic conditions, or because of inadequate light, air, or open space, or because of excessive land coverage, or because diversity of ownership, irregular lot sizes, or obsolete street patterns make it improbable that the area will be redeveloped by the ordinary operations of private enterprise, or by reason of any combination of the foregoing conditions."

"'Sub-standard area,' an area wherein dwellings predominate which, by reason of dilapidation, overcrowding, faulty arrangement or design, lack of ventilation, light, or sanitation facilities, or any combination of these factors, are detrimental to safety, health, morals, welfare or sound growth of a community."

As a basis for its finding that the project site satisfied these statutory definitions, the BRA relied in part on the fact that the proposed project area was located within the boundaries of the Fenway Urban Renewal Area, which had been found in 1965 to be a decadent area. Such a prior finding by the BRA is a legislative determination.[15]

---

[15] We wish to emphasize at this point that our decision today, that the substantial evidence test applies to BRA determinations in connection

We conclude that this legislative finding, although not conclusive, is entitled to great weight in evaluating whether there is presently substantial evidence to indicate that the site is in a decadent or substandard area. If a determination is made in connection with a comprehensive plan long before the commencement of any privately initiated projects, that determination is entitled to great weight. However, in cases in which such a prior determination has been made some years earlier, some data or information concerning the present characteristics of the site should also be contained in the record to satisfy the substantial evidence test. In the present case, the BRA had before it extensive evidence concerning the current condition of the area. The BRA considered the evidence submitted at the hearing, and the BRA members personally viewed the proposed construction site. The BRA also evaluated a building condition examination and classification survey conducted by its staff, from which the BRA concluded that the buildings in the project area were "out of repair, physically deteriorated or dilapidated, unfit for human habitation, or obsolete, and therefore detrimental to the safety, health, morals, welfare and sound growth of the community."

We have examined the total record of the proceedings before the BRA, and we conclude that the prior determination that the Fenway Area was decadent, together with the evidence presented at the hearing, the view of the site, and the building survey, provides substantial evidence supporting the BRA's determination that the area of the proposed project is decadent and/or substandard. See *Save the Bay, Inc.* v. *Department of Pub. Utils.*, 366 Mass. 667, 684-685 (1975).

Statute 1960, c. 652, § 13, further directs the BRA to determine whether "the project will constitute a public use

with c. 121A projects, does not alter the prior law that determinations in connection with publicly initiated plans or projects are legislative and that such findings are reviewed under the arbitrary and capricious standard.

and benefit," and "[i]f the authority finds that the proposed project . . . will not constitute a public use and benefit, it shall disapprove the project." The BRA found that the proposed total energy plant constituted such a public use and benefit.

While c. 652 does not enumerate the relevant criteria on which might be based a finding that the proposed project constitutes a "public use and benefit," c. 121A, § 2, provides: "[A] public exigency exists which makes the use, acquisition, planning, clearance, rehabilitation or rebuilding of such blighted open, decadent or substandard areas for residential, commercial, industrial, institutional, recreational or governmental buildings and appurtenant or incidental facilities as herein provided a public use and benefit for which private property may be acquired by eminent domain or regulated by wholesome and reasonable orders, laws and directions." Edison argues that this statutory language requires that a project must constitute a "public use and benefit" as a result of its elimination of the conditions which render an area decadent, and not as a result of any function of the project following construction. Thus Edison maintains that since the construction of the total energy plant would not result in the elimination of the conditions which characterize an area as decadent and in the prevention of the recurrence of such conditions, the BRA erred in its determination that the proposed project constitutes a public use and benefit.

We conclude that the mere building of a new structure in an area that has been determined to be decadent, with the resultant elimination of the prior decadent conditions, is insufficient to constitute such building a public use and benefit. However, we also conclude that "public use and benefit" is not to be read so as to render consideration of the future uses of the proposed construction irrelevant. Rather, the determination whether a particular project constitutes a public use and benefit should include an evaluation of both the elimination of blight through construction and the nature of the purposes to be served by the proposed project.

A project would thus constitute a public use and benefit if it would result in eliminating substandard conditions and replacing them with something useful and beneficial to the public. See *Dodge* v. *Prudential Ins. Co. of America,* 343 Mass. 375, 383-384 (1961); *Opinion of the Justices,* 341 Mass. 760, 777 (1960).

The BRA properly found that the site of the proposed power plant was a decadent and/or substandard area. Construction of the plant would thus eliminate the substandard conditions in the area. The project will also further the charitable purposes of the MASCO member institutions by allowing them to serve the public with greater efficiency and at less cost. These aspects of the project serve beneficial public purposes. Since the project will eliminate the decadent conditions at its site and since it will provide beneficial public services, the proposed total energy plant constitutes a "public use and benefit."

Edison further argues, however, that our inquiry cannot end here. It urges us to hold invalid the BRA's action because the Applicants did not claim and the BRA did not find that a purpose of the proposal was the elimination of substandard or decadent conditions.

We have held that the motives of the members of a redevelopment authority in approving a project are not a relevant consideration in determining whether a project was properly approved. *Moskow* v. *Boston Redevelopment Auth.,* 349 Mass. 553 (1965), cert. denied, 382 U.S. 983 (1966). *Despatchers' Cafe Inc.* v. *Somerville Hous. Auth.,* 332 Mass. 259 (1955). Since the Legislature has provided specific standards by which the BRA is to determine whether a particular proposal qualifies as an urban redevelopment project, see *Opinion of the Justices,* 341 Mass. 760, 776 (1960), we need not be concerned with the motives of c. 121A applicants. Our inquiry is limited to ascertaining compliance with those standards. We therefore conclude that if an *effect* of a project is to eliminate substandard or decadent conditions, the *purpose* of the applicants in proposing the project is wholly irrelevant. Additionally, requir-

ing the BRA to state that the effectuation of the proposal will eliminate substandard or decadent conditions after it has already determined that the proposed site may be characterized as substandard or decadent would not add anything of substance to the findings which the BRA is now required to make.[16]

5. *Allowance of Deviations from the Zoning Code.*

Statute 1960, c. 652, § 13, provides that "the authority with the approval of the mayor of Boston shall have exclusive power, both before and after the approval of a project, to grant from time to time permission for the project to deviate from such law, code, ordinance or regulation if it finds that such permission may be granted without substantially derogating from the intent and purposes of such law, code, ordinance or regulation." After concluding that to do so would not substantially derogate from the intent and purposes of the zoning code, the BRA granted the Applicants permission to deviate from the use, height, and yard provisions of the zoning code. Edison claims that the BRA's conclusion that such deviations would not substantially derogate from the purposes of the code is erroneous.[17] We disagree.

---

[16] The report of the BRA approving the plan states that the total energy plant will further the charitable purposes of the MASCO institutions. Because the plan contemplates use of the roadbed of Peabody Street, Edison claims that the BRA's approval violates art. 46, § 2, of the Constitution of the Commonwealth which prohibits the appropriation or use of public money or property to aid any hospital or institution which is not publicly owned and operated exclusively by governmental authorities. The record, however, does not disclose that MASCO will not pay for the property. Under such circumstances, no violation of the above-cited constitutional provision necessarily obtains. *Brooks* v. *Boston*, 334 Mass. 285 (1956).

[17] The defendants claim that since Edison has no property interest in the immediate neighborhood, it has no standing to challenge any zoning issues. We agree. Since not all projects under c. 121A will involve zoning variances, we think that as to zoning issues standing is governed by applicable zoning provisions. We have grave doubts about granting standing to any person whose property interest is approximately 1,800 feet, or one-third of a mile (.54 kilometers), away from the site. We deem it signifi-

The standard for granting a zoning variance under c. 652, § 13, that the deviation will not substantially derogate from the intent and purposes of the zoning code, is very similar to one of the standards for the grant of a variance from the zoning code under G. L. c. 40A, § 10.[18] However, the power of the BRA to grant variances is less circumscribed than that of the permit granting authority under G. L. c. 40A, § 10, since the exercise of the BRA's authority is conditioned on fulfillment of only this one criterion. See *Opinion of the Justices*, 341 Mass. 760, 789 (1960). The purposes of the zoning code are "to promote the health, safety, convenience, morals and welfare of the inhabitants of the City, to encourage the most appropriate use of land throughout the City; to prevent overcrowding of land; to conserve the value of land and buildings; to lessen congestion in the streets; to avoid undue concentration of population; to provide adequate light and air; to secure safety from fire, panic and other dangers; to facilitate adequate provision for transportation, water, sewerage, schools, parks and other public requirements; and to preserve and increase the amenities of the City." Boston Zoning Code, art. I, § 1-2.

---

cant that no residential, commercial, or institutional abutter has appealed the BRA's decision to grant deviations from the zoning code. However, since the parties have fully argued and briefed this issue before this court and the court below, we express our views. *Wellesley College* v. *Attorney Gen.*, 313 Mass. 722, 731 (1943).

[18] In pertinent part, G. L. c. 40A, § 10, as appearing in St. 1975, c. 808, § 3, provides: "The permit granting authority shall have the power . . . to grant upon appeal or upon petition with respect to particular land or structures a variance from the terms of the applicable zoning ordinance or by-law where such permit granting authority specifically finds that owing to circumstances relating to the soil conditions, shape, or topography of such land or structures and especially affecting such land or structures but not affecting generally the zoning district in which it is located, a literal enforcement of the provisions of the ordinance or by-law would involve substantial hardship, financial or otherwise, to the petitioner or appellant, and that desirable relief may be granted without substantial detriment to the public good and without nullifying or substantially derogating from the intent or purpose of such ordinance or by-law." See also c. 40A, § 15 (3), as in effect prior to St. 1975, c. 808.

With these general principles in mind, we turn to an evaluation of the propriety of the BRA's granting permission to deviate from the use restrictions of the zoning code. The proposed site was located within two zoning districts established by the zoning code. Approximately one-third of the site was situated in an L-1 zoning district (local business); the remaining area lay in an H-3 zoning district (apartments), a district in which hospitals may operate. Boston Zoning Code, art. 3, § 8-7. The area is characterized primarily by institutional, commercial, and some residential uses. While the office building to be constructed in conjunction with the total energy plant, because it was to be erected in the L-1 zone, was an allowed use, Boston Zoning Code, art. 3, §§ 3-1, 8-7, the remainder of the project would require deviation from the provisions of the zoning code. The BRA determined that the proposed project consisted of "commercial and institutional buildings and appurtenant facilities," and it granted permission to deviate from the established uses.[19]

Edison first argues that the proposed power plant constitutes an industrial use. It refers us to a line of cases, *Benjamin* v. *Board of Appeals of Swansea*, 338 Mass. 257 (1959), *Atherton* v. *Board of Appeals of Bourne*, 334 Mass. 451 (1956), and *Phillips* v. *Board of Appeals of the Bldg. Dep't of Springfield*, 286 Mass. 469 (1934), which, it claims, supports the proposition that a deviation which permits the introduction of industrial establishments into an area zoned for residential and local business uses substantially derogates from the purposes of the zoning code as a matter of law. We conclude, however, that the BRA properly found that the proposed plant consisted of commercial and institutional buildings. In making this determination, the BRA had before it the evidence submitted at the hearing, the survey of

---

[19] Although the zoning requirements were as stated above, the project site fell within the Fenway Urban Renewal Area. The Fenway Plan provided for a change in the land use of that portion of the project area which fell within the H-3 district to higher density institutional use and general business (B-4).

the project area, the application, and the information from the view of the site. From these data there was substantial evidence to conclude that the proposed power plant was an institutional facility, particularly since this evidence could be found to support the conclusion that the power plant would be an integral part of the institutional activities of the MASCO members. Cf. *Children's Hosp. Medical Center* v. *Assessors of Boston,* 353 Mass. 35 (1967).

Moreover, we do not believe that the cases cited support the per se rule which Edison urges on us. Instead, those cases indicate that when an area is zoned for residential purposes and the district has retained its essentially residential character, a variance allowing the introduction of commercial enterprise is improvidently granted. The inquiry which these cases require is whether the introduction of the nonconforming use "would unquestionably alter the essential character of an otherwise residential neighborhood." *Atherton* v. *Board of Appeals of Bourne, supra* at 455. See *Benjamin* v. *Board of Appeals of Swansea, supra* at 261-262; *Phillips* v. *Board of Appeals of the Bldg. Dep't of Springfield, supra* at 471-472. Thus, rather than establishing a rigid rule of law, these cases indicate that the proper approach for determining whether a variance should be granted involves consideration of the property uses existing in the area in relation to the specific new use proposed.[20]

[20] Moreover, we note that the line of cases relied on here by Edison, as well as that cited below in support of its second argument, rested very heavily on the fact that the area into which a new use was sought to be introduced was *residential.* This is not the situation in the present case. Although there are some residences in the area of the proposed project, the site is also characterized by commercial and institutional uses. When such mixed uses are present in an area, the standard for determining whether a variance should be granted often seems to be less strictly applied. See *Kairis* v. *Board of Appeal of Cambridge,* 337 Mass. 528 (1958).

Edison also argues that another line of cases, *DiRico* v. *Board of Appeals of Quincy,* 341 Mass. 607 (1961), *Cary* v. *Board of Appeals of Worcester,* 340 Mass. 748 (1960), and *Hunt* v. *Milton Sav. Bank,* 2 Mass. App. Ct. 133 (1974), establishes the proposition that the introduction of a use which will cause a reduction in the value of adjacent property is in substantial derogation of the purposes of the zoning code. We cannot

Edison further maintains, however, that the actual determination that the proposed deviations would not substantially derogate from the purposes of the zoning code was not supported by substantial evidence.[21] See *Norcross* v. *Board of Appeal of the Bldg. Dep't of Boston*, 255 Mass. 177, 186 (1926). We disagree.

In finding that the construction of the total energy plant at the proposed site would not substantially derogate from the purposes of the zoning code, the BRA considered the information recited *supra*. The BRA also made several subsidiary findings in support of its determination.

The BRA found that construction of the total energy plant "will enable the existing powerhouse [which provides steam], located in the center of the medical area among sensitive institutional uses, to be removed from operation," thus diverting disturbances, including deliveries, to an area closer to the periphery of the institutional area. This result would clearly advance several of the purposes of the zoning

---

perceive any such inflexible rule emerging from these cases. Instead, these cases again instruct that inquiry should focus on the particular factual circumstances obtaining at the time a variance is sought. Even if we were bound to accept the rule urged on us by Edison as a controlling principle of law, we would nevertheless face difficulty in applying it to the present case. The record is devoid of any evidence demonstrating that adjacent property values will decline as a result of the construction of the proposed plant.

[21] In support of its argument that the BRA's determination was not supported by substantial evidence, Edison relies on its contention that there was uncontradicted expert testimony supporting the proposition that the deviations would substantially derogate from the intent and purposes of the code. Edison then argues that disbelief of such testimony cannot create substantial evidence to the contrary. We agree with Edison that such disbelief cannot create affirmative evidence. *Cohen* v. *Board of Registration in Pharmacy*, 350 Mass. 246, 251-252 (1966). However, disbelief of Edison's expert was not the only basis of support for the BRA's conclusion. Rather, as we have noted in the text, substantial affirmative evidence supporting the BRA's determination is found in the record. Edison also relies on this argument concerning disbelief of expert testimony in connection with other issues involved in the present case, particularly the issue concerning conflict with the Master Plan. What we have said here is also applicable to this contention in the context of these other issues.

code, as it would encourage the most appropriate use of land, prevent overcrowding, and lessen congestion. From the data available to it, there was sufficient evidence from which the BRA could have concluded that the construction of the project would have this effect.

The BRA also found that the construction of the proposed plant would further one of the basic goals of the Fenway Plan: "to set the framework for the institutions to consolidate their facilities in order to make more efficient use of scarce land resources." Such an effect would also further the purposes of the zoning code itself, for example, by encouraging the most appropriate use of land and by facilitating more efficient provision of medical services. Again, substantial evidence was available in support of this finding.

We need not review individually each remaining reason which supported the BRA's conclusion that the deviations would not substantially derogate from the stated purposes of the zoning code. The redevelopment statutes do not require any specific number of reasons which might independently support the BRA's ultimate conclusion.

Moreover, the general information before the BRA, particularly its view of the site, provides additional evidence supporting the BRA's determination. In viewing the project area, its members could not have avoided recognizing that, notwithstanding its classification in the zoning code, this area consisted largely of commercial and institutional uses.

The data available to the BRA, coupled with the BRA's subsidiary findings, thus provide sufficient evidence to support its determination that the use deviation did not substantially derogate from the purposes of the zoning code.

Edison also attacks the BRA's determination that deviations from several of the dimensional requirements of the zoning code would not substantially derogate from its purposes.[22] In support of its conclusions concerning these devia-

[22]Edison's claim of injury from the grant of these deviations is even more indirect than its claim involving the use deviations. These dimensional deviations are more properly the concern of abutters. Thus we only briefly express our views on the issue of these deviations.

tions, the BRA relied generally on the subsidiary findings discussed above, as well as on the specific characteristics of each deviation. The BRA properly found that the deviation from the height restriction of the zoning code was minor.[23] The deviations from the front and side yard requirements were properly characterized as minimal, and the goals of these requirements were served by other aspects of the project's design.[24] These characteristics of the dimensional

---

[23] Two-thirds of the project is located in the H-3 zone which has no pertinent height restrictions. A portion of the project (one-third) is located in the L-1 zone where there is a thirty-five foot restriction. Boston Zoning Code art. 13, § 13-1, Table B, and art. 16, § 16-1. The roof of the plant will be 42.5 feet above ground level. Thus, at most, one-third of the plant will deviate from the applicable L-1 (local business) limitation by 7.5 feet. The BRA found this deviation to be minor. We agree that the deviation is properly characterized as minor. See *Miller* v. *Emergency Hous. Comm'n,* 330 Mass. 693, 698 (1953). To the extent that the cooling towers extend beyond the proper height, the BRA properly found this feature to be exempted by the code from the computation of a building's height. See Boston Zoning Code, art. 2, § 2-1 (23), and art. 16, § 16-2. Boston Zoning Code, art. 2, § 2-1 (23), provides: "'Height of building,' the vertical distance of the highest point of the roof, excluding roof structures normally built above the roof and not devoted to human occupancy, above the mean grade of the sidewalk at the line of the street or streets on which the building abuts, or, in the case of a building not abutting on a street, above the mean grade of the ground between the building and whichever of the following is nearer, namely, a line twenty feet from the building or the lot line; but in no event shall the mean grade of such ground be taken to be more than five feet above or below the mean grade of the ground immediately contiguous to the building." Boston Zoning Code, art. 16, § 16-2, provides: "The provisions of Section 16-1 shall not apply to belfries, cupolas, domes, monuments, church spires, water towers, observation towers, radio towers, transmission towers, windmills, chimneys, *smokestacks,* silos, derricks, conveyors, masts, flag poles, aerials, elevator headhouses, water tanks, monitors, signs or other structures normally built above the roof and not devoted to human occupancy, but such structures shall be erected only to such heights, and cover only such areas, as are necessary to accomplish the purpose they are intended to serve" (emphasis added).

[24] The construction of the project would encroach, at the intersections of Francis Street with Brookline Avenue and Binney Street, upon an area required by the zoning code to be unobstructed in order to assure visibility for vehicular traffic. Boston Zoning Code art. 18, § 18-3. The BRA, however, concluded that the project would not interfere with suitable

deviations, together with the subsidiary findings discussed above, provide substantial evidence supporting the BRA's determination that these deviations did not substantially derogate from the intent and purposes of the zoning code.[25]

In sum, we think that the experience of the BRA in matters involving redevelopment in the city of Boston, coupled with the evidence before it in this case, permitted the BRA to find that the granting of these deviations would not substantially derogate from the intent and purposes of the zoning code. Where, as here, there is substantial evidence, if believed, to support the BRA's action, we will not substitute our judgment for that of the agency entrusted by statute with the responsibility for making the determination.

6. *Determination that the Proposed Project Did Not Conflict with the Master Plan.*

As required by c. 652, § 13, the BRA found that the total energy plant would not conflict with the Master Plan for the city of Boston, and further, that it would not be inconsistent with the most suitable development of the city.[26] The 1965-1975 General Plan for the city of Boston is the official Master Plan for the city. The Fenway Plan is a detailing of the

---

traffic visibility. Similarly, Edison contests the deviation permitted by the BRA from the requirement that there be a front yard with a minimum depth of ten feet in that area which is situated in the L-1 zone. Boston Zoning Code, art. 13, § 13-1, Table B, and art. 18, § 18-1. At the street level there would be a pedestrian mall which would provide greater depth of open space than required; the deviation was necessary only in regard to the upper stories of the proposed construction. The BRA concluded that the purposes of the yard requirement were satisfied by the mall. Other deviations from the open space requirements along Francis and Binney Streets were properly allowed by the BRA.

[25]Edison also contends that the underground storage of 1.15 million gallons of oil within the H-3 restricted district was improperly characterized as an accessory or appurtenant use. The data before the BRA provided substantial evidence from which it could conclude that the storage of the oil was such an accessory or appurtenant use.

[26]"[T]he authority . . . shall determine . . . whether such project conflicts with the master plan for the city . . . [and whether it is] inconsistent with the most suitable development of the city." St. 1960, c. 652, § 13.

Master Plan and is expressly stated to be in conformity with the Master Plan. The parties are in agreement that deviation from the Fenway Plan constitutes a conflict with the Master Plan for the city and is inconsistent with the most suitable development of the city.

The heart of Edison's attack on the BRA's finding that the project does not conflict with the Master Plan is its contention that the contemplated land use is industrial in nature. Since the General Plan contemplates no industrial expansion in the area of the proposed plant and since the proposed land uses under the Fenway Plan exclude industrial use at the site of the project, approval of a plan involving an industrial use would conflict with both plans. However, the BRA found that the use involved should be classified as institutional and commercial, and we have sustained this finding. The proposed project, therefore, does not violate any express provision of either plan. Further, the Fenway Plan contemplates the use of the site for commercial and institutional purposes.

Moreover, as a basis for its finding that the construction of the power plant would not conflict with the Master Plan, the BRA determined that the project would effectuate stated goals of the Master Plan. The BRA concluded that the plan "anticipates the consolidation of certain medical facilities with the intent of protecting other communities from unnecessary encroachment." In addition, the BRA determined that "the special locational needs of proximity encourage interaction among medical institutions so as to make available a full range of medical services."

Contending in essence that the aspect of the Master Plan on which the BRA relied in ascertaining these policies relates only to the consolidation of medical and surgical services, Edison disputes the propriety of the BRA's finding that such purpose is advanced by the construction of an energy plant. We note that the Master Plan was drawn up by the BRA and that the BRA is the governmental agency charged with the responsibility of carrying it out. We have stated that the agency interpretation of a legislative policy which is

expressed only in broad terms is entitled to great weight. Cf. *Consolidated Cigar Corp.* v. *Department of Pub. Health,* 372 Mass. 844, 850 (1977). We think that this principle applies in the situation presently under consideration. Moreover, the very section on which Edison claims the BRA erroneously relied states that "[l]and for . . . commercial services which customarily support medical institutions should also be made available . . . ." Given this declared purpose of the Master Plan and the weight which we give to the BRA's interpretation of the Master Plan, we find that the goals of the Master Plan considered by the BRA can be construed as referring to consolidation and integration of power facilities for the MASCO members.

Edison also contends that the BRA should have made an express finding that the project would not conflict with the Fenway Plan. Since the statute does not require that such a finding be made, we find no merit in this contention. Moreover, the BRA did find that construction of the plant would further the stated goals and objectives of the Fenway Plan in that it would (1) "set the framework for the institutions to consolidate their facilities in order to make more efficient use of scarce land resources," and (2) "provide a workable framework for necessary institutional growth."

7. *Failure to Specify Additional Payments to Be Made Pursuant to § 6A.*

General Laws c. 121A, § 10, exempts redevelopment projects from local property and State excise taxation and subjects them only to a special excise tax at a reduced rate. General Laws c. 121A, § 6A, inserted by St. 1960, c. 652, § 5, provides that "[n]othing in section ten shall prevent such contract from further providing for such [redevelopment] corporation to pay to the city . . . with respect to one or more years such specific or ascertainable amount *in addition* to the excise prescribed by section ten as may have been stated in the application" (emphasis added).

While the application for approval of the total energy plant stated that the Applicants would make such additional payments pursuant to § 6A, it did not specify the amount

of such payments. Edison contends that, since the BRA could not consider the amount of the payments in its determination of the reasonableness of the tax concession in relation to the public interest, the vote approving the project was fatally defective.

Although we conclude that § 6A contemplates the disclosure of the amounts of the additional tax payment in the application if such payment is to be made, we do not believe that the omission of the amount renders the BRA's approval of the project invalid. In *Opinion of the Justices*, 341 Mass. 760, 787 (1960), we stated that "[a]n additional payment of this type would be a factor, along with other proper factors, which the . . . Authority should take into account in passing upon applications for the approval of projects. . . ." See *Dodge* v. *Prudential Ins. Co. of America*, 343 Mass. 375 (1961). Concededly, the BRA could not consider this factor by examination of the application or the draft contract which the application purportedly incorporated because the amount of the payment was not specified in either document. Nevertheless, the approximate amount was disclosed at a public hearing on August 26, 1975,[27] and on October 2, 1975, the BRA was informed by the city's corporation counsel that the city and the Applicants had agreed to the specific amount of additional tax payments and the manner in which they were to be made. Thus the BRA had the opportunity, of which the return indicates it availed itself, to consider this factor prior to its vote approving the project on October 9, 1975.

Since the purposes of requiring disclosure have been served, we conclude that the technical noncompliance with the disclosure provision of § 6A should not affect the validity of the BRA's vote.

The BRA's internal rules and regulations require that an application contain "[t]he amount, if any, to be paid to the

---

[27] Because disclosure occurred at a public hearing held approximately six weeks prior to the vote, Edison had notice of the proposed additional amount of tax payment as well as the opportunity to voice its objections if it so desired.

City of Boston, pursuant to contract under Section 6A of Chapter 121A . . . and the year or years in which it is to be paid." BRA Rules and Regulations, § 4, subdivision O. Edison further argues that the failure to disclose the amount of the additional payment violated this rule. For the reasons we have discussed above, technical noncompliance with this rule does not result in the invalidation of the BRA's vote. Moreover, the BRA's Rules and Regulations themselves provide that "if approval or consent is given upon an application, such application shall be deemed to have been submitted in conformity with these rules and regulations." BRA Rules and Regulations, § 1.[28]

8. *Authority of the BRA Members Whose Terms Had Expired Prior to the Vote Approving the Proposed Plan.*

Edison attempts in this proceeding to have us determine whether the members of the BRA validly held public office in 1975.[29] This issue is not properly before us, and it cannot be decided in this proceeding.

It is well established that a public officer's right and title to office cannot be attacked collaterally, but only in a direct proceeding brought to determine the validity of his or her title to the office. See, e.g., *Hill* v. *Trustees of Glenwood Cemetery,* 323 Mass. 388, 393 (1948); *Brierley* v. *Walsh,* 299 Mass. 292, 295 (1938); *Commonwealth* v. *DiStasio,* 297 Mass. 347, 350-352, cert. denied, 302 U.S. 683, and 302 U.S. 759 (1937); *Sevigny* v. *Lizotte,* 260 Mass. 296 (1927).

---

[28] Edison has filed a motion to enlarge the record to reflect the facts that on February 28, 1971, the second amendment to the application for the total energy plant was made, and that such amendment indicates that the estimated cost of the project will be much greater than was anticipated at the time the application was under consideration.

We deny the motion. Absent an allegation of fraud or bad faith, we shall not scrutinize the decisions of the BRA in light of factors which arise long after it has taken action in regard to any particular application. Our review is limited to those facts which were before the BRA at the time of its consideration of a proposed redevelopment project.

[29] It appears that the terms of office of the four BRA members who voted to approve the project on October 9, 1975, had expired respectively in 1971, 1972, 1973, and 1974.

The purpose of this rule is to ensure that public officials have a full opportunity to defend against a challenge in a proceeding where the merits of a particular public matter are not also at issue. *Sheehan's Case,* 122 Mass. 445, 446 (1877). See *Commonwealth* v. *DiStasio, supra* at 350-351.

Moreover, the Legislature placed the authority to institute proceedings against persons allegedly holding public office without proper credentials largely within the discretion of the Attorney General. See *Brierley* v. *Walsh, supra* at 295; *Haupt* v. *Rogers,* 170 Mass. 71, 72-76 (1898); *Attorney Gen.* v. *Sullivan,* 163 Mass. 446, 448 (1895); G. L. c. 249, § 9, as appearing in St. 1973, c. 1114, § 292. By requiring the Attorney General to institute direct proceedings, the Legislature has sought to protect the rights of members of the public who, by necessity, are compelled to do business with an officer who is exercising the duties and privileges of an office under color of right, and at the same time protect public officials from a multiplicity of lawsuits based on individual interests rather than on the public interest. We think this legislative scheme sound.[30] Further, we have recently reiterated the principle that in this Commonwealth actions on behalf of the public interest are committed to the Attorney General. See *Secretary of Administration & Fin.* v. *Attorney Gen.,* 367 Mass. 154, 163 (1975). See also *Feeney* v. *Commonwealth,* 373 Mass. 359 (1977); G. L. c. 249, § 9, as appearing in St. 1973, c. 1114, § 292.[31] We perceive no reason to depart from this rule.

Since the issue of the authority of the BRA members is not properly before us in this proceeding, we express no views

---

[30] The Attorney General has not participated in this proceeding. The record does not reflect any effort by Edison to secure his assistance or to join the members of the BRA individually.

[31] The abolition of the writ of quo warranto, see Mass. R. Civ. P. 81 (b), 365 Mass. 841 (1974), did not eliminate the relief formerly available under the writ. See *Commissioners of Civ. Serv.* v. *Municipal Court of the City of Boston,* 369 Mass. 84, 90 (1975). See also St. 1973, c. 1114, § 292. We emphasize that the civil rules affected the procedure for obtaining relief, not the nature or extent of the relief available.

on the merits of this issue or on the applicability of G. L. c. 121B, § 5,[32] to the facts of this case.

Finally, Edison's argument that c. 652 and c. 121A are unconstitutionally vague and overbroad merits no discussion. We have already considered these statutes in light of these contentions and have sustained their constitutionality. *Dodge* v. *Prudential Ins. Co. of America*, 343 Mass. 375 (1961). *Opinion of the Justices*, 341 Mass. 760 (1960). The failure of the BRA to reach conclusions urged by Edison does not render unconstitutional the statutes under which the agency was operating.

Accordingly, the judgment of the Superior Court dismissing the complaint is affirmed.

*Judgment affirmed.*

QUIRICO, J. (concurring in the result). While I concur in this court's affirmance of the Superior Court's dismissal of the complaint in this case, I would accord to Edison a more limited standing to question the actions of the BRA, and I would apply a more limited scope of review of those actions than does this court.

1. *Standing.*

(a) In part 1 of its opinion, under the heading of "*Standing*," the court states that "while we think the question of Edison's standing is a close one, we conclude that the general principle that harm from expected competition is insufficient to confer standing is inapplicable."

In according Edison standing the court seems to stress the fact that as a consequence of the BRA action Edison will suffer a loss of about $3,000,000 a year in revenues for a period of thirty-five years, thus qualifying as an "aggrieved" person under St. 1960, c. 652, § 13. I agree that in an appro-

---

[32] General Laws c. 121B, § 5, as amended through St. 1974, c. 426, provides in relevant part: "Every member [of the BRA], unless sooner removed, shall serve until the qualification of his successor."

priate proceeding before the proper court or administrative tribunal and with all necessary parties participating, Edison would have standing to contest an application by, or the authorization of, another "Electric company," as defined in G. L. c. 164, § 1, to engage in the business of "making . . . and selling, or distributing and selling, electricity" in any part of the area or territory now served exclusively by Edison, but this is not such a case or proceeding. The BRA cannot give the Applicants authority to operate as an "Electric company" as defined by the statute, and it did not purport to do so.

(b) In part 5 of its opinion, under the heading of *"Allowance of Deviations from the Zoning Code,"* note 17, the court holds that Edison has no standing to challenge the BRA's decision allowing deviations from the zoning code. I agree with that holding. Notwithstanding that holding, the court discusses in considerable detail the several zoning deviations allowed by the BRA and concludes that in allowing them the BRA did not exceed its power with respect thereto. I do not believe that this detailed treatment is necessary in view of the holding that Edison has no standing to be heard thereon.

2. *Scope of Review.*

The court holds that the test to be applied by the court in reviewing certain of the decisions of the BRA is whether they are based on "substantial evidence," and it concludes that there was "substantial evidence" to support those decisions. I refer particularly to the decision that the area in question was a "decadent area" within the meaning of G. L. c. 121A, § 1, and the decision that the proposed project "will constitute a public use and benefit" within the meaning of St. 1960, c. 652, § 13.

This court has held in a long line of decisions that the test to be applied in the judicial review of decisions of these types is much less strict than the "substantial evidence" test being applied by the court in this case. It is sufficient to review but a few of our decisions which have applied either a

"rational basis" test or an "arbitrary or capricious" test commonly applied to legislative decisions.

In *Stockus* v. *Boston Hous. Auth.*, 304 Mass. 507, 509-510 (1939), we said: "There are, undoubtedly, instances where men of training and experience in special subjects related to construction, sanitation, fire prevention, zoning, public health, social service and other subjects might honestly differ in determining whether a certain district was a slum area. If the question is a debatable one, we have no right to substitute our judgment for that of the defendants acting as the local housing authority, upon whom the Legislature conferred the power 'To determine what areas within its jurisdiction constitute sub-standard areas.'" In *Despatchers' Cafe Inc.* v. *Somerville Hous. Auth.*, 332 Mass. 259, 261 (1955), we said in upholding a finding of a housing authority that an area was substandard and decadent: "It is not for the court to take over the functions of the board. . . . If there is any room for the exercise of discretion the judgment of the board must prevail." In *Bowker* v. *Worcester*, 334 Mass. 422 (1956), the plaintiffs sought to introduce evidence in the trial court to controvert the findings of the housing authority that the area in question was "substandard and decadent." We held, at 434, that "[s]uch evidence was properly excluded. The Legislature has given these agencies power to make necessary findings in the circumstances of this case. Their findings are not to be retried in our courts." In *Worcester Knitting Realty Co.* v. *Worcester Hous. Auth.*, 335 Mass. 19, 21 (1956), we said: "The underlying determinations of the authority are such that, viewing the project area as a whole, it cannot be said that it was arbitrary or capricious to find, based on them, that it is a substandard or substandard and decadent area, within the statutory definitions, or that the making of such findings suggests bad faith" (footnote omitted). In *Moskow* v. *Boston Redevelopment Auth.*, 349 Mass. 553, 561 (1965), we said: "No attention can be paid to the allegations that the property at 10 and 28 State Street is not within a decadent, substandard, or blighted open area and that the Authority had no power to

take on such grounds. Courts are not authorized to second guess the Authority in such respects. The allegations, moreover, do not mean that the public bodies designated by statute might not reasonably adjudge otherwise." In our decision in *Reid* v. *Acting Comm'r of the Dep't of Community Affairs*, 362 Mass. 136, 143 (1972), we cited all of the above cases with approval in concluding that hearings of the type conducted by the authorities involved are not adjudicatory but rather are legislative in nature.

In its decision of the present case the court refers to most of the cases cited above, but concludes that they are not applicable to this case. All of those cases involved the taking of private property by eminent domain for either public housing or urban renewal projects. In no one of those cases did we apply the "substantial evidence" test applied in the present case. I do not believe that a more stringent test should be applied in this case which does not involve the taking of any property by eminent domain than was applied in those previous cases on the issues whether the area in question was a "decadent area" and whether the proposed project "will constitute a public use and benefit."